Virginia CLARK, et al., Plaintiffs,

v.

Kenneth KIZER, Defendant.

No. Civ. S–87–1700 LKK.

United States District Court, E.D. California.

Oct. 3, 1990.

John K. Van de Kamp, Atty. Gen., Dennis Eckhart, Supervising Atty. Gen., John R. Pierson, Deputy Atty. Gen., State of Cal., Sacramento, Cal., for defendant.

Robert D. Newman, Western Center on Law & Poverty, Inc., Los Angeles, Cal., Eugenie Denise Mitchell, Marla L. Scharf, Legal Services of N. California, Sacramento, Cal., Ray Fuller, Legal Services of N. Calif., Inc., Chico, Cal., Veronika Kott, Legal Services of N. Calif., Woodland, Cal., Tamara Dahn, Solano Co. Legal Assistance Agency, Vallejo, Cal., Ralph Santiago Abascal, California Rural Legal Assistance, San Francisco, Cal., Standley L. Dorn, Jane Perkins, National Health Law Program, Los Angeles, Cal., Abby H. Lassen, Calif. Rural Legal Assistance, Inc., San Luis Obispo, Cal., Anne Miller, Legal Services of N. Calif., Inc., Redding, Cal., David Grabill, California Rural Legal Assistance, Santa Rosa, Cal., Ellen Jacobs, Andrea Zigman, Legal Aid Soc. of Orange County, Santa Ana, Cal., for plaintiffs.

## ORDER

KARLTON, District Judge.

This matter is before the court on plaintiffs' motion for partial summary judg-

ment. For the reasons I explain below, the motion is GRANTED in part and DENIED in part.

## I

### SUMMARY JUDGMENT STANDARDS UNDER FED.R.CIV.P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as

whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2552.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. at 1355 n. 11; *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. at 1592; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial." *First Nat'l Bank*, 391 U.S. at 290, 88 S.Ct. at 1593; *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller*, 368 U.S. at 468, 82 S.Ct. at 488; *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

## II

### EQUAL ACCESS PROVISION

■ Plaintiffs first contend that Medi-Cal recipients have been denied equal access to dental care in violation of 42 C.F.R. § 447.204. Under federal law, states which participate in the Medicaid program must operate an early and periodic screening, diagnosis and treatment ("EPSDT") program, which includes dental care, for needy children under the age of 21. 42 U.S.C. § 1396d. States also have the option to cover dental care for adults. 42 U.S.C. § 1396d(a)(10). Once a state determines that it will provide optional services, however, the optional services become part of the state Medicaid plan which is subject to the requirements of federal law and federal regulations. 42 U.S.C. § 1396a; *Schweiker v. Gray Panthers*, 453 U.S. 34, 36–37, 101 S.Ct. 2633, 2636–37, 69 L.Ed.2d 460 (1981). Thus, Denti–Cal (the dental component of California's Medicaid program) must comport with the requirements of federal law and federal regulations.

The equal access regulation, 42 C.F.R. § 447.204, provides that:

> The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.

This regulation was originally adopted in 1966 and has been in its present form since 1978. In December 1989, Congress codified this regulation, adding the phrase "in the geographic area" at the end. 42 U.S.C. § 1396a(a)(30)(A).

Whether the State is violating the equal access provision turns upon interpreting the language "available to recipients at least to the extent that those services are available to the general population." As I have previously noted, the first step in statutory construction is to determine whether there is binding authority construing the statute. *Tello v. McMahon*, 677 F.Supp. 1436, 1441 (E.D.Cal.1988). The parties have cited no binding authority construing § 1396a(a)(30)(A) nor has the court's independent research revealed such binding authority.

Turning, therefore, to the language of the statute, it appears that the language is

not clear and unambiguous. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). It is unclear from the text of the statute what constitutes the "general population" to whose access recipients' is to be compared. The legislative history, however, does illuminate this issue. According to the House Budget Committee report, the test for evaluating access is to compare the access of Medicaid recipients living in a specific geographic area with the access of individuals in the same area who have private or public insurance coverage. H.R.Rep. No. 247, 101st Cong., 1st Sess. 390, *reprinted in* 1989 U.S.Code Cong. & Ad.News at 1906, 2116. Construing "general population" to mean "population with insurance" is also consonant with the Secretary of Health and Human Services, regulations which have consistently measured access by comparing that of recipients of Medicaid to that of the insured population. *See generally* Department of Health, Education and Welfare, *Handbook of Public Assistance Administration, Supplement D: Medical Assistance Programs* (1966–67) Part 7–5340 (Plaintiffs' Ex. F) (hereinafter "Handbook"); *see also* Draft State Medicaid Manual, Part 6306.1 (Amicus Ex. B) (comparison between medicaid rates and payment rates of private insurers used as criterion for assessing adequacy of access).

Defining equal access does not, however, resolve the question of how to measure compliance with the regulation. Under the circumstances of this case, it appears that determining the means of measuring compliance with the federal Medicaid program falls within the expertise of the agency charged with its administration. Accordingly, under ordinary principles of administrative law, this court will use the factors established by the agency for measuring compliance. *See White Memorial Medical Center v. Schweiker*, 640 F.2d 1126, 1129 (9th Cir.1981).

The Secretary of Health and Human Services in his amicus brief suggests a multifactor approach for measuring compliance with the equal access regulation. Two major factors used frequently by the Secretary of Health and Human Services and the courts are the level of physician participation in the Medicaid program and the level of reimbursement to participating physicians. As to the first factor, a longstanding criterion used by the Department of Health and Human Services and its predecessor agency, the Department of Health, Education and Welfare, for implementing the equal access requirement is a two-thirds participation ratio. Although this is not a mandatory requirement, it is a useful figure to use for guidance in measuring compliance with the equal access provision. The undisputed facts in this case establish that less than 40% of the licensed dentists in the state treat any Denti–Cal recipients. *See* Kizer's Response to Interrogatories at 6–33 (Ex. A). This is substantially below the two-thirds participation criterion. Defendant asserts the court should use the number of active dentists, rather than licensed dentists, for measuring participation. However, neither case law nor the regulations suggests that the calculation of provider participation rate should be based on active, rather than licensed, dentists. Even if the court were to use the number of active dentists, the participation ratio would only rise to 54%,[1] which is still significantly low. Moreover, the 54% figure includes dentists who treat only one Denti–Cal recipient. In the draft State Medicaid Manual, currently being circulated for comment from the states, a minimum participation ratio of 50% is set as the standard. The 50% standard refers to *full* participation—i.e., accepting all Medicaid patients who present themselves for treatment. It is undisputed that the majority of participating providers are not full participants, with only 12.5% of *active* dentists accepting new patients through the toll-free referral line and many of these dentists placing restrictions on their Denti–Cal practices (*see* Plaintiffs' Exs. A, D). Eleven percent of the participants treated

---

**1.** The 54% figure is based on the declaration of Robert Martinez, Chief of the Dental Contract Section, who avers that based on his experience and research, there are approximately 21,000 licensed dentists, of whom approximately 6,000 are non-active licensed dentists.

only one Denti–Cal recipient during the entire year; 21% treated two to five recipients; and 21% treated 6 to 19 recipients. These figures stand in stark contrast to the 1,300 different patients a year typically treated by a general practitioner. *See* Department of Health Services Report No. MR–MFR 185–R002 (Plaintiffs' Ex. B); Schoen Decl. at paras. 8, 9. Since the Denti–Cal population comprises approximately 10% of the population (*see* Plaintiffs' Ex. Q), the minimal participation by 54% of the dentists who treat fewer than 20 recipients simply cannot be characterized as full participation where their proportionate share should be 130 recipients per participating dentist. No matter how one massages the statistics, the level of dentist participation in Denti–Cal falls dismally below the administrative standard established to measure participation at an acceptable level.

■ The second major factor that may be used in assessing compliance with the equal access provision is the level of reimbursement. From the record before the court, it appears that this factor weighs heavily against the State. It is undisputed that Denti–Cal dentists are reimbursed approximately 40% of their usual rates. Plaintiffs' Ex. H at 3. From 1972 to 1986, the Dental Consumer Price Index increased by an average of 7.42% per year but the maximum reimbursement rates set for the Denti–Cal program increased only 2.91% per year. Plaintiffs' Ex. O at 11. Less than 1% of all dentists statewide filing usual fees with Delta Dental's private insurance program were equal to or less than the Denti–Cal maximum allowance. In addition, several Denti–Cal providers have filed declarations, which are undisputed by defendant, averring that Denti–Cal rates

are not even enough to meet overhead expenses. *See, e.g.,* Mallory Decl. (# 72) at paras. 6–7; Huber Decl. (# 73) at para. 6. Finally, defendant Kizer in a memo to Clifford Allenby, Secretary of Health and Welfare Agency, stated:

> The situation has become so severe that it is no longer unusual to find procedures for which the rates paid are far below any reasonable estimate of what it actually costs providers to render the services.[2]

Although there is not a set number for determining how narrow the differential should be between Denti–Cal reimbursement rates and that for private rates, the gap in the instant case appears to be inordinately large.[3] The California Policy Seminar, in a report prepared for the State Legislature, concludes that at the minimum, a 50% increase would be needed in reimbursement rates just to meet Denti–Cal providers' overhead. *See Access to Dental Care for Medi–Cal Recipients* at 33 (1990). The uncontroverted evidence in the record before the court thus establishes that the present rates are not even adequate to meet overhead, let alone allowing for some marginal profit. As a matter of common sense, reimbursement rates as woefully inadequate as in the instant case strongly indicate that Denti–Cal recipients' access to dental care is not available "to the extent that those services are available to the general population." 42 C.F.R. § 447.204.

As the Secretary of Health and Human Services in his amicus brief suggests, various other factors can be used to measure compliance with the equal access provision. First, are providers widely opting out of the program or restricting their Medicaid caseloads? It is undisputed that providers

---

**2.** Although defendant objects to the use of this statement as being taken out of the context of the anticipated budgetary surplus in which it was made, this is an admission relating to the inadequacy of reimbursement rates. The motive for making the statement (i.e., anticipated budgetary surplus) does not vitiate the force of the admission.

**3.** In the draft State Medicaid Manual currently being circulated to the states for comment, the

Department of Health and Human Services sets a standard of reimbursement rates at least equal to 90% of the average allowance of private insurers. Even if the 90% rate is viewed as only a suggested rate, the record evidence demonstrates that the present reimbursement rate allowed to Denti–Cal providers is only a small percentage of the average allowance of private insurers and certainly does not even remotely approach 90%.

are opting out of the program. Between 1974 and 1984, the percentage of licensed dentists participating in Denti–Cal fell from 83% to 55%. Plaintiffs' Ex. O at 8. Between 1985 and 1988, one-third of the dentists previously participating dropped out of the program. The Secretary also suggests that another factor to consider is whether there is a steady stream of reports that recipients are having difficulty obtaining care. Plaintiffs have filed several declarations which indicate that Denti–Cal recipients cannot find dental treatment. *See, e.g.,* Decl. # 27, Decl. # 25 at para. 3, Decl. # 24 at para. 2, Decl. # 21 at para. 2, Decl. # 1 at paras. 1, 24, Decl. 3 at para. 3.[4] Another factor that may be considered, although not dispositive, is the utilization rate. Using an unduplicated count,[5] Denti–Cal recipients have a 32% utilization. Compared to the 67% utilization rate for the insured population propounded by defendant's own expert, the gross disparity is apparent.

Finally, Department of Health Services personnel have admitted that reimbursement rates are inadequate and that the equal access provision is being violated. *See* Isman Depo. at 89:16–20 ("principle [of equal access] is being violated by the current program"); Taylor Depo. I at 61:8–13 ("all the evidence that I would see and hear about would indicate they probably certainly on the average would not have in general the same access as a middle class dentally insured person in all probability"); Range Depo. at 103:22–104:19 ("I believe that … something happened with the fees or they haven't been raised, and since then there has been increasing difficulty … [i]n

keeping dentists or finding dentists who will see Medi–Cal children in those areas, particularly where there is a shortage of dentists, anyway.").

Weighing all these factors, it is beyond cavil that defendant has not complied with the equal access provision. Defendant asserts that other considerations, such as discomfort in having minorities as patients, may affect the level of provider participation in the Denti–Cal program. Those other considerations, however, are irrelevant. The mandate of the law is clear: the State must assure that "payments … are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent … [as to] the general public." 42 U.S.C. § 1396a(a)(30)(A). Thus, the focus of the law is on the State's ability to encourage participation by setting adequate reimbursement rates. Although other factors may affect provider participation, the statute directs the State's attention to reimbursement levels. Regardless of the interplay of other factors, if the reimbursement levels are not enough to ensure equal access to dental care, then the State has failed in its statutory duty. Moreover, from the record before the court, it is undisputed that the major concern with the Denti–Cal program on the part of dentists is the low reimbursement level. *See* Plaintiffs' Ex. H at 2–3; Blain Decl. # 70 at paras. 2–5 (survey showed 97% listed low reimbursement rates as reason for not accepting Denti–Cal recipients).

I conclude that from the record taken as a whole, a rational trier could not find for

4. Defendant has filed a declaration of David Bierman, the person responsible for researching the declarations of class members filed by plaintiffs in support of the motion for partial summary judgment. Declarant Bierman avers that all of the declarations filed by class members could not be properly researched because social security numbers were not provided by the plaintiffs. However, using the name of the class member declarant, declarant was able to locate the apparent service history of certain class members. As to those class members whose service history defendant was able to research, the averments in the declarations are uncontroverted by defendant's declaration. *Compare, e.g.* Decl. # 1 *with*

Bierman Decl. at para. 4(a) and *compare* Decl. # 3 *with* Bierman Decl. at para. 4(b)(4). Plaintiffs have also submitted the declarations of various individuals responsible for public health at the county level. These uncontroverted declarations indicate that dental care is unavailable to Denti–Cal recipients. *See, e.g.,* Decls. #'s 21, 24, 25, 27.

5. This figure is based on defendant's quantifiable utilization figures, viewed in the light most favorable to defendant. Thus, in calculating the utilization rate, the court added in 51,000 visits made to alternative delivery sites which were not included in the statistical data relied upon by plaintiffs.

defendant and therefore summary judgment must be granted in favor of plaintiffs on the equal access issue.[6]

## III

## FREE CHOICE OF PROVIDER

■ As their fifth cause of action, plaintiffs assert that the State is violating 42 U.S.C. § 1396a(a)(23), which provides that a recipient may *obtain medical care from* "any institution, agency, community pharmacy, or person, qualified to perform the service or services required … who undertakes to provide him such services." Based on their briefs and oral arguments, plaintiffs apparently contend that this provision requires that Denti–Cal recipients must be free to choose whom they will go to for dental care. Applying the sequential analysis for statutory construction previously discussed, I note that this provision has not been authoritatively construed. I must, therefore, undertake an interpretation of the language.

Looking at the plain language of the statute, there appears to be an ambiguity in one clause, but not in another. The term "qualified" is undefined in the statute and is susceptible to at least three interpretations: (1) qualified in the sense of capable or competent to render the services, or (2) qualified in the sense that the State has certified the dentist as a Medi–Cal provider,[7] or (3) qualified in the sense that the provider may only provide those services which are compensable under the State plan.[8] Whatever meaning is ascribed to

"qualified," however, it is contained in a clause modified by "who undertakes to provide him such services." This clause is clear and unambiguous. The free choice to be provided to Denti–Cal recipients is to be among those dentists who choose to participate in the program.[9]

The legislative history does not appear to illuminate congressional intent on the free choice provision. Since this provision of the statute is unambiguous, however, resort to extrinsic aids of construction, such as agency interpretations, would be inappropriate. *See Catholic Social Services, Inc. v. Meese*, 664 F.Supp. 1378, 1383 (E.D. Cal.1987). I note, however, that the implementing regulation mirrors the statutory language except it does not include the modifying language "who undertakes to provide him such services." *See* 42 C.F.R. § 431.51. The guidelines, however, published by the Department of Health and Human Services, *State Medicaid Manual*, §§ 2100–02 (August 1985) (Plaintiffs' Ex. N), which interpret the regulation, do include modifying language, to wit:

> The purpose of the free choice provision is to allow title XIX recipients the same opportunities to choose among *available providers* of covered health care and services as are normally offered to the general population.

*See* Guidelines para. 2100.15 (emphasis added). Thus, the Secretary's interpretation of the statute supports this court's interpretation of the language of the statute, i.e., that the free choice is not to be among all possible dentists from which a recipient

---

**6.** Defendant asserts that proposed improvements (a beneficiary complaint response team, mobile dental clinics, and claims submission and processing improvements) will remedy the equal access problems in the Denti–Cal program. These assertions are simply not supported by any evidence and cannot be given weight.

**7.** Under California Welfare and Institutions Code § 14110, providers are certified by the State for participation in the Medi–Cal program.

**8.** The third interpretation of "qualified" has been used by the District of Columbia District Court. Reasoning that the states are given wide latitude in determining what services will be compensable under the State plan, the court concluded the phrase "qualified to perform the

service" could only mean that a provider is "qualified" if the service is a compensable one. *See Dist. of Col. Pod. Soc. v. District of Columbia*, 407 F.Supp. 1259, 1266 n. 32 (D.D.C.1975).

**9.** Although the court did not find any binding authority construing this provision, the Ninth Circuit case has construed this provision in a case which was subsequently withdrawn as moot. The court construed the phrase "who undertakes to provide him such services" to mean that recipients' free choice rights are limited to those providers who wish to participate in the program. *See Bumpus v. Clark*, 681 F.2d 679, 682–83 (9th Cir.1982), *withdrawn as moot*, 702 F.2d 826 (1983).

might want to choose, but rather is a free choice among those dentists participating in the Denti–Cal program. Regardless of whatever ambiguity inheres in the term "qualified," therefore, plaintiffs' contention that recipients must have the same opportunity to obtain care from a dentist of their choice as do persons who are financially independent simply cannot lie. Since no evidence has been tendered to the court on whether recipients are denied free choice as among the dentists who participate in the Denti–Cal program, summary judgment must be denied on plaintiffs' fifth cause of action.

## IV

## STATEWIDE AVAILABILITY, TIMELY CARE, AND COMPARABLE SERVICES

### A. *Statewide Availability*

■ As their second cause of action, plaintiffs assert that defendant is in violation of the statewide availability requirement of the Medicaid Act. 42 U.S.C. § 1396a(a)(1) provides that the State Medicaid plan "shall be in effect in all political subdivisions of the State." The implementing regulation requires that each state plan must "be in operation statewide." 42 C.F.R. § 431.50. The plain meaning of "be in effect" would appear to be that the Denti–Cal program shall be "in existence, operational and functioning." *See Smith v. Vowell*, 379 F.Supp. 139 (W.D.Tex.), *aff'd*, 504 F.2d 759 (5th Cir. 1974). *See also Morgan v. Cohen*, 665 F.Supp. 1164 (E.D.Pa.1987) (under statewideness provision, services must operate uniformly across the state).

It is undisputed in the instant case that Denti–Cal services do not operate uniformly across the State. No dentists will accept referrals of new Denti–Cal patients through the telephone referral service in twelve counties. Plaintiffs' Ex. D. Specialists routinely reject Denti–Cal patients in 27 counties and only accepted limited referrals in another 21 counties. *See* Decls. 46–69. It thus appears from the record before the court that the Denti–Cal program is not in existence and functioning on a statewide basis, and accordingly, the state is out of compliance with the statewide availability provision.

### B. *Timely Care*

■ As their fourth cause of action, plaintiffs assert that the State is violating the timely care provisions. 42 U.S.C. § 1396a(a)(8) requires that dental care be provided "with reasonable promptness" to all eligible individuals and under § 1396a(a)(19), the care must be provided in a manner consistent with the best interests of the recipients. The undisputed declarations of several county public health officials demonstrate that class members frequently experience delays in obtaining appointments for regular and emergency dental care with those providers participating in Denti–Cal. Defendant has not tendered any evidence supporting a factual dispute regarding the untimeliness of the dental care currently suffered by plaintiffs under the Denti–Cal program.

### C. *Comparable Services*

■ Finally, as their sixth cause of action, plaintiffs assert that the State has violated the comparable services among recipients provision. 42 U.S.C. § 1396a(a)(10)(B) requires that the services made available to one recipient shall not be "less in amount, duration, or scope than the medical assistance made available" to other recipients. Defendant has admitted that "the availability of dental services for Medi–Cal eligibles and the historical utilization rates of dental services by Medi–Cal eligibles vary from county to county." *See* Plaintiffs' Ex. A. There is thus no dispute of fact regarding whether comparable services are available to all recipients.

As there are no material issues of fact in dispute regarding the statewide availability, timely care, and comparable services provisions and as the record before the court demonstrates the State's lack of compliance, I conclude that summary judgment is appropriate in favor of plaintiffs on their second, fourth, and sixth causes of action.

## V
## INJUNCTIVE RELIEF

■ Plaintiffs have submitted a proposed order that would permanently enjoin defendant from continuing to violate the Medicaid provisions that are the subject of the motion for partial summary judgment. Defendant has not objected to the proposed order. The court is unwilling, however, to presume that defendant's lack of objection to the proposed order indicates that injunctive relief is appropriate without briefing on this issue from either party.

■ Injunctive relief is not a matter of right but a matter of balancing the equities and committed to the court's sound discretion. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Even where statutory violations are found, the court must "consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). Since there is nothing in the record to inform my equitable discretion, I cannot grant the injunctive relief proposed by the plaintiffs at this time.

In the event that defendant concedes the propriety of the injunctive relief requested by plaintiffs, defendant shall file with the court, not later than October 12, 1990, a statement of non-opposition. In the event that defendant does not concede the propriety of the injunctive relief requested by plaintiffs, plaintiffs shall file supplemental briefing on this issue not later than October 19, 1990. Defendant's supplemental opposition briefing on this issue shall be filed not later than October 26, 1990.

In accordance with the above, plaintiffs' motion for partial summary judgment on the first, second, fourth, sixth, and tenth causes of action is GRANTED. Plaintiffs' motion for partial summary judgment on the fifth cause of action is DENIED.

IT IS SO ORDERED.