**Vicki FULKERSON, et al., Plaintiffs,**

v.

**COMMISSIONER, MAINE DEPARTMENT OF HUMAN SERVICES, Defendant.**

Civ. No. 92–238–P.

United States District Court, D. Maine.

Aug. 13, 1992.

Jack Comart, Augusta, Me., for plaintiffs.

Sue Jerome, Asst. Atty. Gen., Augusta, Me., for defendant.

## MEMORANDUM DECISION ON DEFENDANT'S MOTION TO DISMISS COUNTS V AND VIII AND ON CROSS–MOTIONS FOR PARTIAL JUDGMENT ON A STIPULATED RECORD [1]

DAVID M. COHEN, United States Magistrate Judge.

In its present posture, this class action raises the question whether final agency rules of the Maine Department of Human Services ("Department" or "DHS") requiring recipients of Medicaid to co-pay for certain medical services violate federal law.[2] DHS has moved to dismiss Counts V and VIII and the parties have otherwise submitted for decision on the merits, on the basis of a stipulated record, the claims asserted in Counts III, IV and VI.[3] Any

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge David M. Cohen conduct all proceedings in this case, including trial, and to order the entry of judgment.

2. The state of Maine participates in the Medicaid program, a cooperative federal-state financial assistance program providing medical assistance to families with dependent children and aged, blind or disabled individuals whose income and resources are insufficient to meet the costs of necessary medical services. *See generally* Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396u. Administration of the program rests primarily with a selected state administrative agency, in this case DHS.

3. The plaintiffs originally sought a temporary restraining order and a preliminary injunction enjoining the planned August 1, 1992 implementation of the Medicaid co-payment rules. However, at a scheduling conference held on July 8, 1992 the plaintiffs agreed to forego their application for preliminary relief based on DHS's agreement to maintain the status quo through August 19, 1992 provided that the court decides all claims except those raised in Counts V and VIII prior to August 20, 1992. The parties agreed that the claims raised in Counts V and VIII, if and to the extent they survive DHS's motion to dismiss, require discovery before they may be submitted for decision on the merits. All state-law claims (Counts II, VII and IX) and

factual disputes as to these claims may therefore be resolved by the court. *See Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 11–12 (1st Cir.1985).

## I. BACKGROUND

This action was brought by and on behalf of all current and future Medicaid recipients in the state of Maine who are currently seeking or will seek to obtain Medicaid coverage for services regarding which a co-payment obligation is imposed. A state is authorized by 42 U.S.C. § 1396*o* (a)(2) and (3) to assess recipients a nominal co-payment amount, as defined by the Secretary of the Department of Health and Human Services ("Secretary"), for each service covered by Medicaid with certain exceptions. No copayments may be imposed with respect to services furnished individuals under 18 years of age, pregnant women (in certain circumstances), certain residents of medical institutions and recipients of services provided by health maintenance organizations (referred to collectively by DHS as "individual exemptions"), as well as emergency services and family planning services (referred to by DHS as "service exemptions"). *See also* 42 C.F.R. § 447.53. The Secretary has established a maximum co-payment chargeable for each service determined in relation to the amount paid by the state for the service. *Id.* § 447.-54(a)(3).[4] The Secretary has further stated that a state plan implementing the Medicaid program "may provide for a cumulative maximum amount for all … co-payment charges that it imposes on any family during a specific period of time." *Id.* § 447.-54(d). Providers are prohibited by statute from denying services because of an eligible recipient's inability to pay a co-payment charge. 42 U.S.C. § 1396*o* (e); 42 C.F.R. § 447.15. However, a recipient who is unable to pay remains indebted to the provider for the required co-payment. *Id.*

In addressing the state's recent budget crisis, the Maine legislature enacted a statute requiring DHS to achieve certain cost savings in the Medicaid program by imposing on recipients co-payment obligations up to a specified amount per day per listed service or by reducing reimbursements to providers, or some combination of the two. Pub.L.1992, Chap. 780, Pt. R, § R–9, Stipulated Record p. 573.[5] The statute requires that any co-payments be nominal in amount with monthly limits or exclusions per service category. *Id.* DHS has promulgated final rules revising the Maine Medical Assistance Manual ("Manual") which, effective September 1, 1992, implement the Maine law. These rules, which are the subject of the plaintiffs' challenge in this action, set forth a schedule of co-payment charges per service per day with monthly caps per service for eleven service categories covered by Medicaid.[6] *See* Notice—Medicaid Co-payments ("Notice"), Stipulated Record pp. 816–17. The rules do not provide for an aggregate cap on the total amount of co-payments that a recipient could owe per month. As explained by DHS at oral argument, the rules place complete responsibility on providers for deter-

---

one federal-law claim (Count I) have been dismissed by stipulation.

I also note that in reading the various counts of the complaint, even in conjunction with the plaintiffs' supporting memorandum, I found it difficult to discern all of the plaintiffs' claims. However, in a July 23, 1992 telephone conference with counsel, the plaintiffs more fully explained their assertions and subsequently filed a letter with the court summarizing the clarifications. *See* letter from plaintiffs' counsel dated July 23, 1992 (Docket Item 21).

4. *States payment for the service/Maximum co-payment chargeable to recipient:*

| | |
|---|---|
| $10 or less | $ .50 |
| $10.01 to $25 | 1.00 |
| $25.01 to $50 | 2.00 |
| $50.01 or more | 3.00 |

*Id.*

5. The statute limits co-payment charges to $2 per day for home health services, ambulance services, physical therapy, speech therapy, podiatry services, psychologist services and chiropractic services; to $3 per day for outpatient hospital services, durable medical equipment services, occupational therapy and substance abuse services; and to $5 per month for private duty nursing and personal care services. *Id.*

6. The Department has elected not to impose co-payment obligations on services provided by physicians and in-patient hospitalization.

mining whether a recipient is receiving an exempt service, for assessing co-payments against a recipient, for keeping track of the co-payments made by each recipient per service per month, for determining whether a monthly service cap has been met and for collecting co-payments that are owed by a recipient. *See, e.g.,* Manual § 5.07–1(D), Stipulated Record p. 19. The rules state that no provider may deny services to a recipient for failure to pay a co-payment obligation and that providers must accept a recipient's representation that he or she is unable to pay. *Id.* § 5.07–1(C).

DHS further explained at oral argument that recipients will receive a new Medicaid card every month marked to signify whether they qualify for an individual exemption which excludes them from liability for co-payments under any circumstances. *See, e.g.,* Notice, Stipulated Record p. 816. A "no" in the co-pay column of the card identifies individuals who are not required to pay any co-payment amount. *Id.* Along with this card, recipients will receive each month a notice that lists all of the individual exemptions and states that they have a right to a hearing if they believe themselves exempt and a "no" does not appear in the co-pay column of their card. *See id.* p. 817. Prior to the effective date of the co-pay rules, each recipient will receive a notice ("initial notice") that lists the individual exemptions, the service exemptions, a chart showing the co-payment charges per service based on cost of service and the daily and monthly co-payment caps per service and the statutory authority for imposition of co-payments. *Id.* The notice informs recipients that they may not be denied a service because of an inability to pay a co-payment obligation but that they may continue to owe the provider the co-payment amount. *Id.* p. 816. As in the case of the monthly notice, it is explained in the initial notice that if recipients believe they have been incorrectly classified they are entitled to a fair hearing and may request such a hearing by writing to DHS at the listed address. *Id.* p. 817. According to

the initial notice, if a recipient has a dispute with a provider because he has been charged a co-payment amount although he is exempt, or has reached a daily or monthly cap, or has been charged the wrong amount or has been denied a service, he may call DHS at the listed telephone number for assistance. *Id.*

## II. AVAILABILITY OF § 1983 REMEDY FOR COUNTS V AND VIII

The plaintiffs allege in Counts V and VIII that the co-payment rules violate 42 U.S.C. § 1396a(a)(30)(A) in two respects. That section requires that a state plan implementing the Medicaid program

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

*Id.*

In Count V the plaintiffs specifically assert that the Department's co-payment policy, as embodied in the rules, "will result in an insufficient number of providers to ensure that Medicaid services are available to recipients at least to the extent that those services are available to the general population" and is therefore violative of the equal-access-to-care requirements of section 1396a(a)(30)(A) and 42 C.F.R. § 447.-204.[7] Complaint ¶ 60. In Count VIII the plaintiffs contend that the rules do not assure that Medicaid payments are consistent with efficiency, economy and quality of care as also mandated by section 1396a(a)(30)(A).[8]

---

**7.** 42 C.F.R. § 447.204 simply restates the statute's equal access requirements.

**8.** *See* clarifying letter of plaintiffs' counsel (Docket Item 21). Count VIII also contains an allegation that the rules violate 42 U.S.C.

DHS contends that recipients do not have a right to sue under section 1983 because subsection (a)(30)(A) is clearly intended to benefit service providers—not recipients— and that, in any event, its language is too ambiguous to create an enforceable right under section 1983. Defendant's Memorandum in Support of Motion to Dismiss Counts V and VIII at 4–8. The plaintiffs respond that the purpose of the Medicaid Act as a whole is to benefit recipients, *see* 42 U.S.C. § 1396a(a), that subsection (a)(30)(A) was clearly intended to ensure that recipients enjoy quality care and equal access to medical services and that these provisions are sufficiently specific and binding to be enforceable under section 1983. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss Counts V and VIII at 1–5.

It is well-established that section 1983 provides a private cause of action for violations of federal statutes. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). The United States Supreme Court has recognized only two exceptions to this rule. No cause of action will lie where (1) "the statute [does] not create enforceable rights ... within the meaning of § 1983," or (2) "Congress has foreclosed such enforcement of the statute in the enactment itself." *Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987).

In deciding whether 42 U.S.C. § 1396a(a)(30)(A) creates "enforceable rights" I am to apply a three-part test. I must first consider whether the equal-access-to-care and efficiency requirements were "intend[ed] to benefit" the class plaintiffs. *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) (citation and internal quotation marks omitted); *see also Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). If so, then I must find that a right enforceable under section 1983 exists unless the language of subsection (a)(30)(A) "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit," *id.* (quoting *Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)), or unless it is " 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce,' " *id.* (quoting *Golden State,* 493 U.S. at 106, 110 S.Ct. at 448). Applying this analysis, I am persuaded that subsection (a)(30)(A) does create an enforceable right, within the meaning of section 1983, to equal access to care (Count V), but not to efficiency, economy and quality of care (Count VIII).

### A. Equal Access

■ The language requiring equal access to care was clearly intended to benefit the class plaintiffs. In arguing to the contrary, DHS states that the language speaks primarily about payment rates and providers and that therefore providers, not recipients, are the intended beneficiaries. Defendant's Reply to Plaintiffs' Opposition to Motion to Dismiss Counts V and VIII at 4–5. Such a reading is unpersuasive in light of the plain language of subsection (a)(30)(A) which proclaims that payments to providers must be sufficient to ensure that recipients have equal access to services. It is evident that in enacting this provision Congress recognized sufficiency of payment rates as an important factor in determining the number of providers that would make their services available to recipients. It is similarly evident that Congress intended to require state Medicaid plans to provide adequate payments to providers for the very purpose of enlisting enough of them to ensure that recipients would have equal access to medical care.

In addition, I find that the equal access provision creates a binding obligation on states with Medicaid programs. In a recent suit brought by service providers in Virginia, the Supreme Court held a similar

§ 1396a(a)(13)(F). However, at oral argument the plaintiffs conceded the inapplicability of this

provision.

provision of the Medicaid Act providing for reasonable and adequate rates enforceable by providers under section 1983. *Wilder,* 496 U.S. at 512, 110 S.Ct. at 2518. At issue was a requirement of 42 U.S.C. § 1396a(a)(13)(A) that a state plan for Medicaid assistance provide for payment rates for services "which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...." As a basis for its decision the Court relied on the facts that the statutory provision is "cast in mandatory rather than precatory terms," the "provision of federal funds is expressly conditioned on compliance" with the statute, the Secretary is "authorized to withhold funds for noncompliance," and the Secretary had "expressed his intention to withhold funds if the state plan does not comply with the statute or if there is 'noncompliance in practice.'" *Wilder,* 496 U.S. at 512, 110 S.Ct. at 2518 (citing 42 U.S.C. §§ 1396a(a)(13)(A), 1396c; 42 C.F.R. § 430.35).

The equal access provision at issue in this case is enforceable for the same reasons relied upon by the *Wilder* Court. Subsection (a)(30)(A) provides that the state plan *must* assure that payments are sufficient to ensure equal access. *Id.* Furthermore, the same provisions conditioning federal funding on compliance with the Secretary's regulations cited in *Wilder* are also applicable to subsection (a)(30)(A). *See* 42 U.S.C. § 1396c; 42 C.F.R. § 430.35.

■ Finally, I conclude that the provision concerning equal access is not so vague and amorphous as to be beyond the competence of the judiciary to enforce. Although the plain language of the statute is not entirely clear and unambiguous, at least one court, aided by the provision's legislative history and the Secretary's posi-

tion as to how compliance should be measured,[9] has found the provision sufficiently definite to enforce. *Clark v. Kizer,* 758 F.Supp. 572 (E.D.Cal.1990). I find the court's approach persuasive. It certainly appears that statistical data can be compiled indicating the extent to which medical services available to the general population in Maine are also available to Medicaid recipients.

### B. Efficiency, Economy and Quality of Care

■ By contrast, I find that the requirement that state plans assure that Medicaid payments are consistent with efficiency, economy and quality of care is too vague and amorphous and therefore beyond the competence of the judiciary to enforce. Neither the statute nor the regulations sufficiently define the standard. To be sure, the regulations at 42 C.F.R. §§ 447.202–.203 require the Medicaid agency to assure appropriate audit of records (if payment is based on costs of services or on a fee plus cost of materials), maintain documentation of payment rates and record certain estimates relating to the range of customary charges and increases in payment rates. This information, however, will not alone or in combination with other data allow for an objective determination to be made as to whether a particular state plan satisfies the "efficiency, economy and quality of care" requirement. Indeed, the requirement necessarily establishes a tension between Congress's concern for keeping Medicaid costs as low as possible on the one hand and its regard for providing quality care to Medicaid recipients on the other. The accommodation of these competing objectives requires specialized knowledge of the workings of the health care system and the exercise of significant administrative discretion in allocating scarce fiscal resources. That is a task for which the Secretary, not

---

9. In reaching its decision the court relied heavily on an amicus brief filed by the Secretary in which he suggested "a multifactor approach for measuring compliance with the equal access regulation." *Clark,* 758 F.Supp. at 576. The court went on to explain that "[t]wo major factors used frequently by the Secretary of Health and Human Services and the courts are the level

of physician participation in the Medicaid program and the level of reimbursement to participating physicians." *Id.* The court's analysis then elaborated on these two factors and took account of the statistical data in the record regarding them. *See id.* at 576–77. Other factors were also discussed. *See id.* at 577–78.

the courts, is uniquely qualified. Accordingly, I conclude that the plaintiffs' claim asserted in Count VIII is not enforceable under section 1983.

## III. COUNT III

■ The plaintiffs assert that the Department's rules violate the requirements of 42 C.F.R. §§ 431.200–.220 by failing to provide a hearing right and notice thereof to recipients in circumstances where the provider determines that services have been furnished on a non-emergency basis but the recipient disagrees and claims a service exemption.[10] Plaintiffs' Memorandum at 40–41; Plaintiffs' Reply Memorandum in Support of Preliminary Injunction and Partial Judgment on a Stipulated Record ("Plaintiffs' Reply") at 16–17. The Department responds by arguing that hearing and notice rights are triggered only by agency action and that a provider's classification of a service rendered in a specific situation as "emergency" or "non-emergency" is not an agency action. Memorandum in Support of Defendant's Partial Judgment Motion and in Opposition to Plaintiffs' Motions for Partial Judgment and Preliminary Injunction ("Defendant's Memorandum") at 30–32.

Federal regulations provide a right to a hearing to "[a]ny recipient who requests it because he believes the agency has taken an action erroneously," 42 C.F.R. § 431.-220(a)(2), and to notice of such a hearing right, *id.* § 431.206. An action is defined as "a termination, suspension, or reduction

of Medicaid eligibility or covered services." *Id.* § 431.201.

The crux of the issue presented in Count III is whether a provider's classification of a service as "emergency" or "non-emergency" is an agency action implicating the right to a hearing.[11] I find that it is not. The Supreme Court's opinion in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), is controlling. In *Blum*, the Court held that determinations made by a committee of private physicians authorized by the Secretary's regulations to evaluate the level of nursing home care which is medically necessary for Medicare recipients did not constitute state action. *Id.* at 1005–06 & n. 15, 102 S.Ct. at 2786 & n. 15. The Court reasoned that the state was not responsible for these purely private determinations simply because it required the completion of a form explaining the physicians' assessment. *Id.* at 1006–07 & n. 15, 102 S.Ct. at 2786 & n. 15. The Court's opinion stands for the proposition that state action does not attach to a provider's judgment as to the level of nursing home care needed by a Medicaid recipient— at least where the provider's decision is not affirmatively mandated by state regulations. Likewise, a provider's determination that in a particular circumstance a service is or is not an "emergency service" as defined in the rules necessarily involves a medical judgment not mandated by DHS.[12] Finding, as I do, that provider "emergency service" determinations do not constitute agency action, I conclude that such determinations do not trigger hearing and notice

---

**10.** Initially, the plaintiffs also argued that the rules fail to properly provide for a hearing right and notice to recipients who may in the future qualify for an individual exemption, such as pregnancy. However, at oral argument DHS conceded that its determination of individual exemptions each month—as listed on the monthly Medicaid cards sent to recipients—constitutes agency action and agreed to provide notice and a hearing right as required by law in these circumstances. On the same occasion the plaintiffs conceded that "emergency services" was the only service exemption category as to which they continue to press their Count III claim.

**11.** "Emergency services" is defined in the rules and the notice as "when failure to provide the service could reasonably be expected to: 1) place the recipient's health in serious jeopardy, 2) cause serious impairment to bodily functions, or 3) cause serious dysfunction of any bodily organ or part." *See, e.g.,* Stipulated Record pp. 19, 816; *see also,* 42 C.F.R. § 447.53(b)(4).

**12.** I am mindful of the fact that co-payments create a strong incentive for providers to err on the side of finding that a service is "emergency service" exempt, thereby assuring full reimbursement by DHS and avoiding co-payment collectibility issues.

rights under 42 C.F.R. §§ ·431.220(a)(2) and 431.206.

The plaintiffs also assert in their amended complaint that co-payments should be enjoined because DHS has failed to comply with the notice requirements of 42 C.F.R. § 447.205(a) which provides, *inter alia*, that "the agency must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." Plaintiffs' Memorandum at 31–35. In response, DHS argues that the imposition of co-payments on recipients does not constitute a method and standard for setting payment rates for services.[13] Defendant's Memorandum at 33.

■ I find that section 447.205 is not applicable to the imposition of co-payments. Although plaintiffs acknowledge that the regulation was amended in 1981, they do so only in support of their argument that the co-payments are "significant." *See* Plaintiffs' Reply at 8 n. 3. Prior to amendment, section 447.205(a) stated, in relevant part, that "the agency must provide public notice of any proposed change in the Statewide method or level of reimbursement for a service, if the change is expected to increase or decrease Medicaid payments for that service by 1 percent or more during the 12 months following the effective date of the change." *See Morabito v. Blum*, 528 F.Supp. 252, 267· (S.D.N.Y.1981). The 1981 amendment worked a substantial change. Instead of focusing on methods and levels of *reimbursement*, the regulation now addresses itself to methods and standards for setting *rates*. The many cases cited by the plaintiffs, which find

that the imposition of co-payments are a change in the method of reimbursement, *see, e.g., id.* at 268–70, all construe the pre–1981 amendment version of section 447.-205(a) and are therefore inapposite. At oral argument, the plaintiffs asserted that the language "setting payment rates" in section 447.205(a) refers to the amounts actually paid by DHS to providers, *i.e.* less any co-payments, and not to the overall approved schedule of rates of payment to providers for services rendered. I find this argument unpersuasive and conclude that the imposition of co-payments does not constitute a method or standard of setting payment rates.[14] This conclusion is consistent with the Maine legislature's view that co-payments are an· alternative to changing payment rates, as expressed in the state statute authorizing the . imposition of co-payments as a means of effecting mandated Medicaid budget cuts. *See* P.L.1992, Chap. 780, § R–9, Stipulated Record p. 573.

## IV. COUNT IV

■ The plaintiffs also argue that the co-payments embodied in the new rules are not "nominal" within the meaning of 42 U.S.C. § 1396*o* (a)(3). Plaintiffs' Memorandum at 43–45. The plaintiffs do not appear to challenge the Secretary's· implementing regulations as violative of the statute itself. Rather, they seem to argue that DHS has misinterpreted and hence violated the Secretary's regulations at 42 C.F.R. § 447.-54(d) by adopting a per-service per-day cap on the co-payments rather than a cumulative maximum per period for all such co-

**13.** DHS argues in the alternative that, even if implementation of the new co-payment rules would trigger the requirements of section 447.-205(c), the plaintiffs have not shown these co-payments to be "significant" and that, even if significant, the respects in which DHS's notice fail to comply with section 447.205(c) are not substantial enough to warrant enjoining the co-payment policy. Defendant's Memorandum at 34–35. Given my findings above, I need not decide these alternative claims.

DHS also argues that, to the extent the plaintiffs' section 447.205 claim relates to their argument that co-payments must be consistent with 42 U.S.C. § 1396a(a)(30)(A), it should be stricken as unenforceable under section 1983. Defen-

dant's Memorandum ·at 29 n. 14. I understand the plaintiffs' section 447.205 claim to be unrelated to their section 1396a(a)(30)(A) claims, raised in Counts V and VIII, and therefore do not address the enforceability issue in this context.

**14.** The plaintiffs also cited at oral argument as support for their position the "Background" section of the December 3, 1981 public notice of changes in section 447.205(a) reported at 46 Fed.Reg. 58,677. A careful review of the entire notice, including the "Background" section, makes clear that the language relied upon by the plaintiffs discusses the former, not the current, version of the regulation.

payments.[15] Although DHS contends that section 447.54(d) must be read to allow a state to implement a cumulative maximum at its discretion, Defendant's Memorandum at 38–40, the plaintiffs argue that the regulations are consistent with the nominality requirement of the statute only if the language "may provide for a cumulative maximum" is interpreted to require a state to adopt a cumulative maximum cap on co-payments. Plaintiffs' Memorandum at 43–45.

I conclude that section 447.54(d) leaves to the discretion of the state the decision whether to provide for a cumulative maximum on co-payments. The Supreme Court has stated that the use of the word "may" in a statute usually implies "some degree of discretion." *United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983). The Court has commented, however, that "[t]his common-sense principle of statutory construction is by no means invariable ... and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute...." *Id.* In divining the meaning of a regulation, this court must give "considerable weight" to the Secretary's own interpretation of it. *McCuin v. Secretary of Health & Human Servs.,* 817 F.2d 161, 168 (1st Cir.1987) (citing *Udall v. Tallman,* 380

U.S. 1, 16–17, 85 S.Ct. 792, 800–01, 13 L.Ed.2d 616 (1965)). Where, as here, the matter at issue—determining what is nominal cost-sharing in the Medicaid program— is within the "agency's field of expertise," great deference to the agency's interpretation is appropriate. *Id.* at 168. The Secretary has implicitly acknowledged that section 447.54(d) does not require that a cumulative maximum be adopted. 50 Fed.Reg. 23,009 at (II)(5)(b).[16] The plaintiffs have failed to cite any cases, and my own research has unearthed none, in which a court has construed section 447.54(d) as other than a discretionary provision.[17] Accordingly, the plaintiffs' section 447.54(d) claim must fail.

## V. COUNT VI

■ The plaintiffs next assert that, because the new co-payment rules allow certain decisions to be made by providers, they violate the statutory requirement that a single state agency make all eligibility determinations. Plaintiffs' Memorandum at 35–38. Specifically, the plaintiffs assert that the agency has delegated to providers responsibility for determining whether a recipient is exempt from any co-payment obligations because she is pregnant, has received emergency services or has reached her monthly cap. *Id.* The plaintiffs con-

15. Federal law requires that any co-payment adopted by a state be "nominal in amount." 42 U.S.C. § 1396o (a)(3). Congress expressly delegated to the Secretary responsibility for determining what is nominal requiring only that, "if the definition of 'nominal' under the regulations in effect on July 1, 1982 is changed, [the Secretary's regulations shall] take into account the level of cash assistance provided in such State and such other criteria as the Secretary determines to be appropriate." *Id.* Pursuant to that delegation, the Secretary has promulgated 42 C.F.R. § 447.54(a)(3) and § 447.54(d). Section 447.54(a)(3) contains a table specifying the maximum amount of co-payment chargeable to a recipient per service based on the cost of the service. Section 447.54(d) provides that "[t]he plan *may* provide for a cumulative maximum amount for all deductible, coinsurance or co-payment charges that it imposes on any family during a specified period of time." (Emphasis added.) To the extent the plaintiffs intend to assert that the use of the word "nominal" in the statute compels adoption of a cumulative maximum, I disagree. The statutory language makes

clear that the Secretary alone decides what is nominal.

16. In responding to a comment, filed in connection with the proposed adoption of the cost-sharing regulations, that the cumulative maximum cost-sharing charge a recipient or family may be required to pay under section 447.54(d) should be mandatory, the Secretary stated that the comment raised an issue relating to the definition of nominal cost-sharing charges and that his department was reviewing the need to revise the definition and would consider the comment as part of that review. Clearly, if the Secretary intended section 447.54(d) to require a cumulative maximum, he would have pointed out to the commenter that such a cumulative cap was already mandatory.

17. It is noteworthy that the majority of those states imposing co-payments on Medicaid recipients impose neither per service caps nor an aggregate monthly cap. *See* Stipulated Record pp. 852–62.

tend that this delegation is especially egregious because recipients who have been denied a service due to failure to pay or who are compelled to pay are not afforded notice or hearing rights. *Id.* at 36. DHS responds that it has retained all administrative discretion and delegated only decision making that requires medical judgment, which is permitted. Defendant's Memorandum at 36–38. In particular, the agency argues that, since a recipient may never be denied a service by a provider, providers do not make any eligibility determinations; that it is permissible to delegate to providers the task of tracking the number of co-payments charged to recipients for monthly-cap purposes because no discretion is involved; that the determination as to whether a person receives services on an emergency basis is based solely on the application of a detailed standard set forth in the rules and involves medical judgments best made by providers; and that the agency alone classifies a woman as pregnant. *Id.*

Federal law provides that a state plan implementing the Medicaid program must "[s]pecify a single State agency established or designated to administer or supervise the administration of the plan." 42 C.F.R. § 431.10(b)(1); *see also* 42 U.S.C. § 1396a(a)(5). "In order for an agency to qualify as the Medicaid agency ... [it] must not delegate, to other than its own officials, authority to ... [e]xercise administrative discretion in the administration or supervision of the plan." 42 C.F.R. § 431.-10(e)(1)(i). It appears that the reason for this requirement was to assure "that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided" and "to avoid a lack of accountability for the appropriate operation of the program." *Hillburn v. Maher,* 795 F.2d 252, 261 (2d Cir.1986) (quoting in part S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 2016–17), *cert.* denied,

479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987).

Contrary to the plaintiffs' assertion, it is clear that, by virtue of its monthly updating of recipients' Medicaid cards, DHS determines whether a woman has a pregnancy exemption and that this decision is not entrusted to service providers. Given the fact that the rules state that no provider may deny services on the basis of a recipient's ability to pay and that providers must accept a recipient's representation that he is unable to pay, I can find no support for the plaintiffs' contention that providers have the discretion to deny services. Similarly, providers are charged with keeping track of monthly caps, and although they may err in their calculations the schedule they must apply in determining when a recipient assumes a co-payment obligation and how much is owed is very precise with the result that there is nothing discretionary about the providers' responsibility.

In addition, the definition of an emergency as set forth in the rules [18] is very specific and leaves virtually no room for administrative discretion. Any discretion that does exist could only be deemed to involve medical, not administrative, judgment, *see Blum,* 457 U.S. at 1006–07 & n. 15, 102 S.Ct. at 2786 & n. 15, and does not implicate quality or availability of care—which are the concerns that the legislative history suggests underlie the single state agency requirement. It should also be noted that the unlikelihood of any such discretion adversely affecting recipients supports the conclusion that the rules do not violate the single state agency requirement. *See Morgan v. Cohen,* 665 F.Supp. 1164, 1177–78 (E.D.Pa.1987) (discretion excessive and violative of single state agency requirement largely because it provided incentive for providers to reduce quality of service). There is little risk that if providers exercise any discretion under the rules they will err on the side of finding recipients liable for co-payments.[19]

---

18. *See supra* n. 11.

19. *See supra* n. 12. According to affidavits in the record, *see, e.g.,* Affidavit of Dennis E.

Brockway, Stipulated Record p. 601, providers have great concern that they will be unable to collect co-payments from recipients of non-emergency services, whereas they are assured of

## VI. CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss is GRANTED as to Count VIII but DENIED as to Count V, and the defendant's motion for partial judgment on a stipulated record (Counts III, IV and VI) is GRANTED and the plaintiffs' cross-motion is DENIED.

reimbursement from DHS if the service is deter- ·. mined to be an emergency service.