Tobias MARTINEZ, Dorothy Franco, and Katherine Williams, individually, and on behalf of all others similarly situated, Plaintiffs,

v.

Irene IBARRA, Director of the Colorado Department of Social Services, in her official capacity, Defendant.

Civ. A. No. 89-K-1479.

United States District Court, D. Colorado.

March 20, 1991.

Peter Komlos–Hrobsky, Linda Sue Anderson, Linda J. Olson, Legal Aid Soc. of Metropolitan Denver, Denver, Colo., for plaintiffs.

David Temple, Asst. Atty. Gen., Human Resources Section, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiffs are members of a class of disabled individuals who were denied care under Colorado's Home and Community Based Services program.

HCBS is a program administered by the Colorado Department of Social Services. The program provides various statutorily defined services designed to assist disabled people to live at home and avoid nursing institutions. The services provided in the recipient's home include health, transportation, and housekeeping assistance. *See:* 42 C.F.R. § 440.180; 10 C.C.R. 2505–10 § 8.484.01.

HCBS is a Medicaid "waiver" program. Medicaid is a joint federal and state program designed to provide medical assistance to people whose income is insufficient to support the cost of health care. States which choose to participate in Medicaid are required to provide care for certain groups of low income individuals. Other groups may be covered under different optional programs. Colorado participates in a long-term program, HCBS, which serves aged, blind and disabled people. These recipients are sometimes referred to colloquially as "three-hundred percenters." The description refers to their monthly income which is not more than three times the low minimum income threshold which automatically insures medicaid coverage.

The HCBS program is called a "waiver" program because certain statutory Medicaid requirements are waived by the Secretary of Health and Human Services. Before a state receives federal funding for the program, the state must sign a waiver agreement with the United States Department of Health and Human Services. The agreement waives certain eligibility and income requirements. The terms of the HCBS waiver program are set out in 42 U.S.C. § 1396n(c) (1984).

Under the Colorado program, "three-hundred percenters" may receive either nursing home care or home based care provided they meet eligibility requirements. Eligibility is especially important to "three hundred percenters" because nursing home care and HCBS is the only way for them to qualify for general Medicaid benefits.

Qualifying for long term care requires a showing of functional impairment. Impairment is measured by a level of care screen called the "LTC–101." The LTC–101 evaluates 15 different categories of patient impairment, *See:* 10 C.C.R. 2505–10, § 8.401.11. From these categories, a functional assessment score is quantified. A minimum score of 20 demonstrates a sufficient need for long term care and admission to a nursing institution. All three named plaintiffs scored above 20 on the LTC–101 and received HCBS benefits.

On June 15, 1989, the rules changed. The Colorado Department of Social Services adopted an additional hurdle screen to evaluate HCBS eligibility,[1] 10 C.C.R. 2505–10 § 8.485.41(b). The additional criteria is called the "Most In Need Screen," or "MINS." The MINS isolates four specific categories from the LTC–101: confusion, mobility, bladder incontinence and bowel incontinence. In order to qualify automatically for HCBS, candidates must meet threshold scores in at least two of the four MINS categories.

Those who do not satisfy the MINS may still be eligible for HCBS benefits. Their cases must be favorably reviewed by one physician and then a panel of physicians from the Colorado Foundation for Medical Care. CFMC is a peer review organization with which the state contracts to conduct medical evaluations. CFMC evaluates the patient's functional limitations and eligibility for HCBS.

Plaintiffs attack the adoption of the MINS as a violation of the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.* and their constitutional right to due process. Jurisdiction for plaintiffs' claims for injunctive and de-

---

**1.** According to the State, nursing home care is still available to disabled people who score over 20 points on the LTC–101. Since recipients; understandably, prefer to remain at home, HCBS is more desirable.

claratory relief is found under 28 U.S.C. § 1331.

Plaintiff argues the following:

I. The MINS creates eligibility criteria which do not comport with federal Medicaid law, and violates their rights to due process.

II. The MINS violates federal "comparability" protection.

III. The MINS violates federal "state plan" and "request for waiver" requirements.

IV. The MINS violates federal "freedom of choice" provisions.

V. The MINS improperly allows termination of benefits without an improvement in condition.

Both parties claim they are entitled to summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper when "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Plaintiffs argue the application of the MINS and related regulations violates the law and deprives them of their rights. The issues are legal. Finding no dispute about facts "material" to this suit, I will decide the merits of the dispute on the parties' motions for summary judgment.

I. Does the MINS Create Eligibility Criteria Which Do Not Comport with Federal Medicaid Law or Which Violate the Right to Due Process?

The statutory authority for state waiver plans to provide home based care is found in 42 U.S.C. § 1396n(c)(1) (1983 and Supp. 1990):

The Secretary may by waiver provide that a State plan approved under this chapter may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services ... approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a skilled nursing facility or intermediate care facility the cost of which could be reimbursed under the State plan.

Plaintiffs correctly analyze this provision as a limitation on states' authority to provide "home or community based" services only to those people exhibiting the need for a specified "level of care." The "level" is described as the kind of care which an institution can provide. The level of care called for in the statute will be referred to as "institution level care."

Plaintiffs argue Colorado's MINS regulation requires recipients to show a need for a higher level of care before they may receive HCBS. First, applicants must score 20 points on the LTC–101. This score will admit the applicant to a nursing facility. But Colorado requires more from HCBS recipients. They must also pass a second review: the MINS screen. Passing the MINS screen entails demonstrating disability in two of four MINS categories, or a favorable recommendation from the CFMC review panel.

Plaintiff's argument that MINS requires recipients to demonstrate the need for a "higher" level of care is understandable. If an initial score of 20 on the LTC–101 test is enough to qualify for admission to long-term care in an institution, the logical conclusion is people who score 20 or more need "institution level care." Otherwise, the State would be forced to argue the patients who score 20 and are admitted to institutions do not need institution level care.

Confronted with this possible contradiction, the State argues more scrutiny is necessary for HCBS applicants. According to the State, nursing home admission procedure "polices itself:" people are generally averse to trading a comfortable home for the impersonal quarters of an institution. Furthermore, the State expressed concern over potential fraud and abuse by people who feign disability to gain admittance to the program. Approval of HCBS benefits automatically creates eligibility for general

Medicaid. The State, however, provided no evidence in its brief that this is anything but a hypothetical concern. In contrast, the medical information documenting the plaintiffs' conditions provides ample evidence of their genuine need.

I will not advise the State how best to screen potential HCBS recipients. Instead, I will evaluate the MIN regulation with two issues in mind. First, the regulation must comply with § 1396n(c)(1). Second, the MINS procedure must provide due process.

The State regulation describing its MIN eligibility procedure, 10 C.C.R. 2505–10, § 8.485.41 complies with federal law up to a point. The federal statute, § 1396n(c)(1) allows HCBS benefits to a group of people who need a "level of care" which an institution can provide. Under an approved state plan, however, this group may also be served at home. "But for" HCBS, these people would be cared for in an institution. The statute seems to prevent states from providing HCBS too freely. Hence, Colorado may be extra cautious in handing out HCBS. It may require an additional screen for HCBS applicants without offending the federal law. These additional screening procedures, however, may only screen for the condition the statute prescribes: the need for "institution level care."

Based on the affidavit of David West, Colorado Director of Programs for Medical Services, I am satisfied that the four MINS criteria comply with the "level of care" inquiry mandated by federal law. According to West, medical experts designed MINS to isolate four impairments which indicate the need for institutionalization. West explains confusion, mobility, bladder incontinence, and bowel incontinence are most often present in nursing home residents.

Initially, West's analysis seems skewed. He purportedly surveyed nursing home residents to find out what symptoms are responsible for their institutionalization. He isolated four and developed the MINS. Ironically, the four MINS conditions which send people to nursing facilities now assure a patient home-based care. But this is what the statute requires: HCBS is only available to nursing home "care level" recipients.

The four MINS conditions are shorthand indicators to admit deserving applicants automatically. The State, however, emphasizes repeatedly that each of the four MINS categories is one indicia of disability; no one is denied HCBS based on a rigid adherence to the four MINS factors. People not automatically passed through the screen are offered a review by a neutral panel of physicians.

There is good reason for this. Forcing applicants to demonstrate two of four medical disabilities in a preliminary screening can produce arbitrary results and a deprivation of rights. The example of plaintiff, Dorothy Franco, demonstrates the inconsistent results of MINS if no hearing were held to review the outcome. Ms. Franco requires kidney dialysis three times a week. Because of her kidney problems, she passes little urine. Hence, bladder incontinence, a MINS category, is masked by her more serious kidney condition. Hence, Ms. Franco's chances for easy access to HCBS are 25% less than a person with healthy kidneys even though both could require the same "institution level of care." Due process is about preventing arbitrary treatment by one's government. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The CFMC review must be designed to protect the due process rights of the medically disabled community. Public entitlements have long been recognized as property to be protected by due process. *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (citing: Reich, *The New Property*, 73 Yale L.J. 733 (1964)). Although *Goldberg*, concerned termination of welfare benefits, its discussion of hearing rights is instructive. The Court stated, "These [hearing] rights are important in cases such as those before us, where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of

particular cases." *Goldberg*, 397 U.S. at 268, 90 S.Ct. at 1020.

Having established the importance of the medical review, I find fault with the appeal process described in the MIN regulation. First, the review procedure is never articulated in clear, written standards. In *White v. Roughton*, 530 F.2d 750 (7th Cir.1976), a case where public assistance was denied, the court required of the municipality, "Fair and consistent application of ... written standards and regulations." *Id.*, at 754. The court was leery of the official's "unfettered discretion." Such discretion violates due process. Plaintiffs cite several documents and A.L.J. opinions produced after CFMC review. The materials differ on the relative importance of factors like dependency on Medicaid services and the availability of family members as alternate care providers. The defendant failed to call attention to any significant regulation guiding the CFMC panels in their review.

The one MIN regulation cited by the State appears inconsistent with federal law. Hence, a second defect with the review process is a misapplication of the standard established in § 1396n(c)(1). As explained before, the proper inquiry under § 1396n(c)(1) is, does the applicant require institutional level care? The Colorado regulation focuses on whether the disabled person is at risk of "imminent placement in a nursing facility." CFMC may approve HCBS benefits if: 1) the disabled person requires "HCBS in order to avoid certain and imminent placement in a nursing facility; or 2) the person has "become dependent upon such long term care services provided by, and available to them only through the HCBS program." 10 C.C.R. 2505–10. § 8.485.415(c)(1), (2).

"Dependency" is defined as "requiring continuing HCB services in order to prevent the client's functional/medical condition from deteriorating ... such that they would eventually meet the MINS criteria." *Id.* The definition of dependency makes reference to the MINS screen. The MINS criteria, without the physician review panel, are four simple medical conditions. Hence, the review process which protects a

person's due process rights is defined in terms of the arbitrary screen which necessitated the physician review in the first place.

Contrary to the State's representations at oral argument, nothing in the regulation instructs the panel to re-examine the applicant to determine if he needs institution level care. The statute is worded as if there is a presumption that people who fail the MINS do not need such care. The regulation assigns to the panel the role of finding an exception for a particular patient, if it chooses.

Finally, the conclusion the State draws from recent practical data is flawed. According to West, 301 people were denied HCBS due to the MIN regulation between July 1989 and March 1990. Approximately 129 people appealed their denials and their benefits continued, or they were re-enrolled. Triumphantly, West reports only five of the 301 have entered nursing homes. A different conclusion could be drawn. Scores of Colorado disabled people are suffering at home with inadequate care and lack the resources to pay for the care they need.

## II. Does The MINS Violate Federal "Comparability" Protection?

■ The plaintiffs' argument about comparable treatment among patients with comparable need seems promising. The "comparability requirement" is outlined in 42 U.S.C. § 1396a(a)(10)(B):

(a) A State plan for medical assistance must—
  (10) provide—
  (B) that the medical assistance made available to any individual described in subparagraph (A)—
  (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual.

Plaintiffs qualify for "comparability" protection under subparagraph (10)(A)(ii)(VI). Plaintiffs argue the MINS discriminates among "such individuals" who need nursing home care. Only four of the fifteen LTC–101 categories are singled out for au-

tomatic admission to HCBS. For example, a deaf and blind person (two other LTC–101 categories) might require a high level of care. His disabilities are not favored under MINS. Hence, the "amount" of "medical assistance" he receives may not be comparable.

Unfortunately, the comparability requirement does not apply to HCBS. In 42 C.F.R. § 440.250(k), the requirement is waived for HCBS programs:

> If the agency has been granted a waiver of the requirements of § 440.240 (Comparability of services) in order to provide home or community based services under § 440.180, the services provided under the waiver need not be comparable for all individuals within a group.

At page three, the waiver application filed by Colorado specifically requests exemption from "amount, duration, and scope" requirements. Hence, individuals who need the same level of care may be distinguished from each other. Plaintiffs argue the waiver request does not mention MINS. This fact is not important; the application waived comparability requirements for the HCBS program. The MINS, adjusted to comply with § 1396n(c)(1), is a proper procedure within the program.

### III. Does the MINS Violate Federal "State Plan" and "Request for Waiver" Requirements?

■ Plaintiffs criticize the MIN regulation as a violation of the "state plan" requirement contained in 42 U.S.C. §§ 1396a(a), (b). State plans must include descriptions of state "waiver" programs like HCBS, 42 U.S.C. § 1396n(c)(1). Also, the waiver application itself must include a description of the waiver program, and the group the program is designed to serve. According to the plaintiffs, the MIN regulation is not found in either the state plan or waiver application.

State plans must be amended to reflect "(ii) Material changes in State law organization, or policy, or in the State's operation of the medicaid program." 42 C.F.R. § 430.12(c). I do not find the change "material" such that the plan must be amended. The MIN regulation does not abolish HCBS; it merely scrutinizes the eligibility of applicants. Corrected of its defects, MINS is a valid selection tool.

Likewise, the group being served by the waiver program remains the same: functionally disabled people who require a level of care provided by institutions. Without a change in coverage, the waiver request need not reflect adoption of the MIN regulation.

### IV. Does The MINS Violate Federal "Freedom of Choice" Provisions?

■ Plaintiffs believe they are entitled to a choice between home-based care and institutionalization. Their best authority is found in 42 C.F.R. § 441.302(d) which provides:

> HCFA will not grant a waiver under this subpart and may terminate a waiver unless the Medicaid agency ...
>
> (d) Assur[es] that ... the recipient or his or her legal representative will be
>
> (1) Informed of any feasible alternatives available under the waiver; and
>
> (2) Given the choice of either institutional or home and community based services.

The regulation, implements § 1396n(c)(2)(C). The first requirement forces states to disclose care options accurately to potential recipients. Those alternatives, however, must be feasible. If a patient does not qualify for a specific waiver program, that alternative is not "feasible."

Likewise, if a person is not eligible for HCBS, the second requirement cannot be construed to guarantee that person the "choice." If, after extensive inquiry, MINS is found to be a valid selection procedure, two sentences in a regulation will not alter this conclusion. Eligibility for HCBS cannot be manufactured by this provision. Finally, plaintiff's reference to a "general guarantee" that medicaid recipients be treated as equals with the "general population" does not support their freedom of choice argument.

V. Does The MINS Improperly Allow Termination of Benefits Without an Improvement in Condition?

 Plaintiffs point out that their conditions have not improved, but their HCBS benefits were terminated. According to the plaintiffs, this violates their due process rights and is contrary to the rule announced in *Weaver v. Dept. of Social Services*, 791 P.2d 1230 (Colo.App.1990).

Since jurisdiction is premised on a federal question, this court is not bound by the decision in *Weaver.* Regardless, the case is distinguishable. *Weaver* concerned an HCBS recipient whose condition was evaluated on the LTC–101 scale four separate times. The evaluations produced wildly different results. Based on the lower scores, he was dropped from the program. But his doctor stated his condition remained constant.

The facts in this case are different. None of the plaintiffs argue their LTC–101 scores were arbitrarily adjusted below the specified minimum. Instead, a new evaluation process, the MINS, rendered them ineligible. *Weaver* does not address the state's power to change existing regulations, only the arbitrary application of existing standards.

In conclusion, the State is free to carefully scrutinize applicants to the HCBS program. It may also employ a four factor MINS screen to quickly pass eligible applicants into the program. Rigid adherence to the four factors, however, produces arbitrary results. Hence, a hearing procedure including review by independent physicians is necessary to protect applicants' rights to due process.

The goal of the review process must be identifying people in need of "institution level care." The review process presently employed by the Colorado Department of Social Services is defective for two reasons. First, it lacks clear, written standards controlling the substance and procedure of the physician review. Second, the few regulations in place evaluate applicants for medical conditions not in accord with federal law controlling the program. Cured of these defects, the Colorado waiver plan, filed with the U.S. Department of Health and Human Services, is sufficient. Accordingly, plaintiffs' motion for summary judgment is

GRANTED.