**Jesse McMILLAN, Paula Malek, and Melvin McCullough, Plaintiffs,**

v.

**Audrey McCRIMON and Phil Bradley, Defendants.**

No. 92–2187.

United States District Court,
C.D. Illinois,
Danville Division.

Aug. 17, 1992.

Valerie McWilliams, [COR LD NTC] Land of Lincoln Legal Assistance Foundation, Inc., Champaign, IL, Richard Chase, D, [COR LD NTC], Linda Zazove, [COR LD NTC], Land of Lincoln Legal Assistance Foundation, Inc., East St. Louis, IL, for plaintiffs.

Carol J. Barlow, and Phillip McQuillan, [COR LD NTC], Asst. Attys. Gen., Springfield, IL, for defendants.

## ORDER

BAKER, District Judge.

The plaintiffs filed this class action against Audrey McCrimon, Director of the Illinois Department of Rehabilitation Services (DORS), and Phil Bradley, Director of the Illinois Department of Public Aid (IDPA), alleging that the defendants' refusal to accept and process applications for the Home Services Program violates the Medicaid statute, 42 U.S.C. § 1396n, its implementing regulations, 42 C.F.R. § 431.200 *et seq.*, and the Due Process Clause of the Fourteenth Amendment. Along with the complaint, the plaintiffs filed a motion for a preliminary injunction (docket # 5) and a motion for class certification. (docket # 7) The court held a hearing on both motions on July 7, 1992. At the hearing, the court granted the plaintiffs' request for class certification and certified the class under Fed.R.Civ.P. 23(b)(2).[1] After reviewing the materials submitted at the hearing, the court ordered the parties to file additional memoranda addressing specific issues. (docket # 18) The parties submitted supplemental briefs on August 3, 1992. For the reasons discussed below, the court now grants the plaintiffs' request for a preliminary injunction.

---

1. The class is defined as:

All Medicaid-eligible persons who have tried or will try to apply for services under the DORS Home Services Programs since February 3, 1992, for whom DORS has refused or will refuse to process their request for services due to the closing of intake.

## DISCUSSION

The Home Services Program (HSP) is a Medicaid program designed to prevent the unnecessary institutionalization of disabled persons. Illinois enacted the HSP, found at section 3(g) of the Disabled Persons Rehabilitation Act, Ill.Rev.Stat. ch. 23, para. 3434, as a waiver program under 42 U.S.C. Section 1396n(c). The HSP provides support services such as personal care, housekeeping and delivered meals. IDPA has delegated operational responsibility for the HSP to DORS which administers two HSP programs: one to assist physically disabled persons between the ages of 21 and 59 and another to aid individuals with AIDS, ARC, or HIV infections. On February 14, 1992, DORS published an emergency rule in the Illinois Register, providing that, as of February 3, 1992, DORS shall not make applications for HSP services available. 16 Ill.Reg. 2688, 2694 (1992) (Exhibit A Attached to Plaintiffs' Brief in Support of Preliminary Injunction). The authority for this rule is the Emergency Budget Reduction Act of Fiscal Year 1992 which the General Assembly enacted in January, 1992. Public Act 87–0838 (Exhibit D Attached to Plaintiffs' Brief in Support of Preliminary Injunction). The amendment to the HSP statute states:

> Notwithstanding any other provision of this Act to the contrary, the Department is authorized to limit services, to reduce or adjust payment rates, and to modify eligibility criteria under this subsection (g) as necessary to implement contingency reserves under the Emergency Budget Act of Fiscal Year 1992, to the extent permitted by federal law. Any such modification, adjustment, reduction or limitation shall expire on July 1, 1992.[2]

See Ill.Rev.Stat. ch. 23, para. 3434(g) (1992). At the hearing, the plaintiffs submitted a copy of a bill that amends paragraph 3434(g) and states: "Starting July 1, 1992, and for a period of one year thereaf-

ter, the Department is authorized to suspend, from time to time, the application process." Plaintiff's Exhibit 1. (docket # 17) The regulations interpreting the HSP are found at 89 Ill.Adm.Code 683.100 et seq. An amendment to these regulations, effective July 1, 1992, states: "DORS shall not make applications available to individuals wishing to apply for services through HSP." 16 Ill.Reg. 11681, 11685 (1992) (adding 89 Ill.Adm.Code 673.-30). The amendments to the regulations also provide that "applicants/preapplicants shall not have the right to appeal ... any action or inaction on the part of DORS related to the refusal by DORS to take an application." 16 Ill.Reg. at 11686 (adding 89 Ill.Adm.Code 673.50).

The plaintiffs are severely disabled persons who are eligible for Medicaid and who assert that, as a result of their disabilities, they are at risk of institutionalization. The plaintiffs claim that they would be able to avoid entering nursing homes if they could apply for the Home Services Program (HSP). In their complaint, the plaintiffs allege that the State's refusal to accept HSP applications is not permitted by federal law. The plaintiffs also contend that, under the emergency rule, DORS is supposed to be gathering information on all persons seeking HSP but "these 'pre-applicants' are not considered clients and have no right to appeal any action or inaction of DORS. Many individuals have been discouraged from even providing the pre-application level of information after being advised there is no money available at the present time." Complaint. para. 25.

*Motion for a Preliminary Injunction*

[1] The plaintiffs seek to have the court enjoin the defendants to:

1. Resume processing new applications for assistance under the Home Services Program pursuant to the regulations in place prior to February 3, 1992.

---

2. In their complaint, the plaintiffs claim that the State's proposed budget for fiscal year 1993 (beginning on July 1, 1992) also fails to include funding to resume processing new applications under the HSP. Since the plaintiffs filed the complaint, the State has enacted a budget for

fiscal year 1993. The plaintiffs stated at the hearing that the 1993 budget does not include sufficient funding for the HSP. Moreover, both parties agreed that, since enacting the new budget, the State has not begun accepting applications for the HSP.

2. Transfer all "pre-applications" received since February 3, 1992 into active applications.

Brief in Support of Motion for Preliminary Injunction at 3. (docket # 6) In deciding whether to issue a preliminary injunction, the court must consider several factors: (1) whether the plaintiffs will be irreparably harmed if the injunction does not issue; (2) whether the plaintiffs have an adequate remedy at law; (3) whether the plaintiffs have some likelihood of success on the merits; (4) whether the threatened harm to the plaintiffs outweighs the possible harm to the defendants if the court grants the injunction; and (5) how the plaintiffs' likelihood of success effects the balance of harms. *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386–88 (7th Cir.1984). If the decision to grant or deny a preliminary injunction will involve the public interest, then the court must consider the public interest in the weighing process. *Id.*

To prevail on a motion for a preliminary injunction, the plaintiff carries the burden of demonstrating each factor. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1015 (7th Cir.1990); *Illinois Council on Long Term Care v. Bradley*, 759 F.Supp. 1309, 1311 (N.D.Ill.1991) (citing *Kellas v. Lane*, 923 F.2d 492, 493 (7th Cir.1990)), *aff'd*, 957 F.2d 305 (7th Cir. 1992). However, the plaintiff's threshold burden is to satisfy the first three factors. *Ping v. National Educ. Ass'n*, 870 F.2d 1369, 1371 (7th Cir.1989). Once the plaintiff has met this burden, "the inquiry then becomes a 'sliding scale' analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits." *Id.*

Inadequate Remedy at Law and Irreparable Harm

In their briefs and in the testimony of Paula Malek and Jesse McMillan, the plaintiffs have demonstrated that, without the ability to apply for and receive the HSP, they face institutionalization in nursing homes. Paula Malek is a 31 year old diabetic who received a kidney and pancreas transplant at the University of Illinois Hospital in November, 1991. After the transplant, Ms. Malek experienced an allergic reaction to the anti-rejection drug. Her doctors transferred her to a Pittsburgh hospital for treatment with an experimental drug. Through the use of this drug, Ms. Malek's transplant stabilized and she returned to Illinois. However, the allergic reaction damaged her spinal cord and her vision; she is now a paraplegic and only has limited vision in one eye. In addition, Ms. Malek does not have control over her bowels and bladder.

Ms. Malek originally hoped to live in her mother's home in Chicago after her release from the University of Illinois Hospital. Because her mother leaves for work at 6:30 a.m. and works all day, Ms. Malek was relying on the HSP to provide care during the day. In June, 1992, Ms. Malek learned that DORS was not accepting applications for the HSP. She and her mother began searching for a nursing home for her to enter upon her release. She testified at the hearing that most nursing homes would not accept her because she required exceptional care. Although she located one nursing home willing to accept her, the nursing home would not protect the experimental drug which she still receives from Pittsburgh. Instead, the nursing home told her that she would have to keep the experimental drug herself. In addition, she could not receive continued rehabilitation at the nursing home, and she believed that she would loose contact with her transplant surgeons. The prospect of living in the nursing home caused her to suffer emotionally and physically. To protect her transplants, Ms. Malek decided to live with her mother.

Ms. Malek was released from the hospital a few weeks before the hearing in this case. She testified that visiting nurses and therapists provide care for her for a number of hours a week. However, she is home alone for several hours a day. Because she is confined to her wheel chair during those hours, she faces serious risks of infection and complications.

Jesse McMillan, a 42 year old, suffers from Guillain–Barre syndrome and is HIV

positive. He was in the hospital from December, 1991 until April, 1992.[3] Guillain-Barre syndrome has weakened Mr. McMillan's legs and arms and caused sensory loss. Although his condition is improving and he is beginning to walk with a walker, he still cannot stand and balance and has no strength in his hands. Mr. McMillan does not anticipate being able to return to his job as a manager of a Ponderosa Steak House for a year. His only income now is social security disability income. At this time, he needs assistance with all of his daily needs. Because he cannot apply for the HSP, he relies on volunteers to help him. However, his volunteer help has been erratic, and he testified that he constantly worries that a volunteer will not show up. Mr. McMillan also testified that he would not be able to continue rehabilitation if he was in a nursing home. Also, Cathy Schowengerdt, a social worker at Covenant Medical Center in Champaign, testified that the fact that Mr. McMillan is HIV positive made it difficult to place him in a nursing home.

Richard Goodwin, who works for an advocacy organization for disabled persons, testified that persons in nursing homes usually do not receive rehabilitation and a person who does not receive rehabilitation services is not likely to leave a nursing home. The plaintiffs also submitted a copy of a letter that McCrimon wrote to the Director of the Bureau of the Budget, explaining why it is not cost effective to close HSP intake. In the letter, McCrimon states: "Once placed in a nursing home for more than a brief period it is very costly to deinstitutionalize a person due to the rapid decay of support systems, loss of living quarters, furniture etc. and a change in ... emotional attachments."

Based on all of this evidence, the court finds that the plaintiffs have demonstrated that they will suffer irreparable harm if the injunction does not issue. The possibility that the plaintiffs would be forced to enter nursing homes constitutes irreparable harm that cannot be prevented or fully rectified by a judgment later. *See Roland Mach.*, 749 F.2d at 386. The plaintiffs also have shown the inadequacy of any remedy at law. The nature of their claim—a claim against the state for medical services—makes it impossible to say that any remedy at law could compensate them.

### Likelihood of Success

■ To establish some likelihood of success on the merits, the plaintiffs only need to show that their chances of succeeding are better than negligible. *Roland Mach.*, 749 F.2d at 387. Here, the plaintiffs allege that the State's refusal to accept and process applications for the HSP violates 42 U.S.C. Section 1396a(a)(8) and 42 C.F.R. Section 435.906. In addition, the plaintiffs claim that the State is violating their rights under the Due Process Clause of the Fourteenth Amendment.

### Medicaid Act

■ Through Title XIX of the Social Security Act, 42 U.S.C. Section 1396 *et seq.*, commonly known as the Medicaid Act, the federal government provides "financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX" and the regulations issued by the Secretary of Health and Human Services. *Id.; Schweiker v. Gray Panthers*, 453 U.S. 34, 36–37, 101 S.Ct. 2633, 2636–37, 69 L.Ed.2d 460 (1981); *Smith v. Miller*, 665 F.2d 172, 175 (7th Cir.1981); 42 U.S.C. Section 1396a. Under the Act, the states must provide certain services to the "categorically needy." 42 U.S.C. Sections 1396a(a)(10) & 1396d(a)(1)–(5), (17) & (21). A participating state may also elect to provide additional optional services to the "categorically needy" and to other "medically needy" persons, as defined by the Act. 42 U.S.C.

---

**3.** Mr. McMillan testified that the hospital could have released him earlier if he had home care services.

Sections 1396a(a)(10)(A)(ii) & (C) and 1396d(a). However, once a state elects to offer optional services, "it is bound to act in compliance with the Act and the applicable regulations in the implementation of those services." *Weaver v. Reagen*, 886 F.2d 194, 197 (8th Cir.1989); *Clark v. Kizer*, 758 F.Supp. 572, 575 (E.D.Cal.1990) (optional services become part of state Medicaid plan which is subject to the requirements of federal law and federal regulations). Therefore, a state's discretion in creating its Medicaid program is not unbridled. *Weaver*, 886 F.2d at 197.

The Medicaid Act includes detailed requirements with which a state plan for medical assistance must comply to be approved for federal funding. 42 U.S.C. Section 1396a(a); *State of Ohio v. United States Department of Health and Human Servs.*, 761 F.2d 1187, 1188 (6th Cir.1985). Specifically, the Medicaid Act provides that a state plan for medical assistance must "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all individuals." 42 U.S.C. Section 1396a(a)(8). In addition, the regulations state: "The agency must afford an individual wishing to do so the opportunity to apply for Medicaid without delay." 42 C.F.R. Section 435.906.

■ The plaintiffs argue that the State's refusal to accept and process applications for the HSP violates these provisions. In response, the defendants claim that the provisions of section 1396a(a)(8) and section 435.906 only apply to the initial application for Medicaid and not to persons who are already in receipt of assistance and are seeking additional benefits. According to the defendants, the plaintiffs already have Medicaid cards and, therefore, had an opportunity pursuant to these provisions to apply for assistance. The provisions do not apply to the application process necessary to participate in the HSP. At the hearing, the administrator of the HSP stated that he believed that § 1396a(a)(8) only applied to applications for Medicaid, not to applica-

tions for the HSP. Therefore, the first issue that the court must address is whether the requirements of section 1396a(a)(8) apply to applications for benefits beyond the initial application for Medicaid. For two reasons, the court finds that this section applies to more than the initial Medicaid application.

First, the term "medical assistance," as used in section 1396a(a)(8), is defined in other provisions of the Medicaid Act. Section 1396d(a) defines "medical assistance" as payment of part or all of the costs of twenty-four listed types of services. 42 U.S.C. Section 1396d(a). Also, section 1396n(c), the waiver provision under which the State enacted the HSP, states that "[t]he Secretary may by waiver provide that a State plan approved under this subchapter may include as 'medical assistance' under such plan payment for part or all of the cost of home or community-based services." 42 U.S.C. Section 1396n(c)(1). Based on these two provisions, "medical assistance" includes additional services and benefits under a state's medicaid plan. Therefore, the court concludes that section 1396a(a)(8)'s requirement that the state plan provide all individuals the opportunity "to make an application for medical assistance under the plan" must extend beyond the initial application for Medicaid eligibility to services and benefits provided to Medicaid eligible persons.

Second, courts have interpreted the second clause in section 1396a(a)(8)—"such assistance shall be furnished with reasonable promptness to all eligible individuals"—as applying to benefits beyond the initial application for Medicaid. For example, in *Clark*, the court applied the timely care provision in section 1396a(a)(8) to the provision of dental care which is a benefit that a Medicaid recipient may obtain after the initial eligibility determination. 758 F.Supp. at 575, 580 (states have the option to cover dental care for adults). The court held that "42 U.S.C. Section 1396a(a)(8) requires that dental care be provided 'with reasonable promptness' to all eligible individuals." *Id.* at 580. *See also Linton v. Carney*, 779 F.Supp. 925 (M.D.Tenn.1990) (Tennessee's limited bed policy violated section

1396a(a)(8) by causing extended delays in access to long term nursing home care); *Morgan v. Cohen,* 665 F.Supp. 1164, 1177 (E.D.Pa.1987); *Doe v. Pickett,* 480 F.Supp. 1218 (S.D.W.Va.1979). In *Smith,* the plaintiffs challenged the IDPA's failure to set specific time standards for processing requests for prior approval of medical and dental treatments under section 1396a(a)(8). 665 F.2d at 174.[4] Although it is possible to distinguish between the type of Medicaid benefits involved in *Smith* and in this case, *Smith* at least indicates that the timely care clause in section 1396a(a)(8) applies to more than the initial Medicaid eligibility determination. This interpretation of the second clause as covering the provision of specific benefits supports the plaintiffs' argument that section 1396a(a)(8) applies to applications for benefits beyond the initial application for Medicaid.[5]

The next issue is whether section 1396a(a)(8) specifically applies to applications for benefits provided under a waiver program such as the HSP. 42 U.S.C. Section 1396n(c) allows a participating state to apply for a waiver from the Secretary of Health and Human Services to permit the state to include as "medical assistance" payment for part or all of the cost of home or community-based care assistance. *Martinez v. Ibarra,* 759 F.Supp. 664, 665 (D.Colo.1991). If the Secretary approves a waiver under this section, the state may provide home or community-based services to individuals who would otherwise require the level of care provided in a hospital or nursing facility or an intermediate care facility for the mentally retarded. 42 U.S.C. Section 1396n(c)(1); *Beckwith v. Kizer,* 912 F.2d 1139, 1140 (9th Cir.1990). The Illinois HSP is a waiver program under 42 U.S.C. Section 1396n(c) designed to provide the home care services listed in section 1396n(c)(4)(B). *See* Defendants' Supplemental Brief at 3. (docket # 19)

As a waiver program, the HSP is not a service which the Medicaid Act requires a state to provide to certain individuals. *See* 42 U.S.C. Section 1396a(a)(10)(A). Instead, it is an optional service which the state has elected to provide as part of its plan for medical assistance. The State asserts that it can refuse to accept applications for the HSP due to the fact that it is an optional service under the Medicaid Act.

▮ The court recognizes that a state has broad discretion in administering its Medicaid program. *Smith,* 665 F.2d at 178. Moreover, when a state includes an optional service in its plan, the state is free to set the level of care it will offer above the minimal requirements of the Medicaid Act. *King v. Sullivan,* 776 F.Supp. 645, 651 (D.R.I.1991). However, as stated above, once a state elects to offer optional services, it must comply with the requirements of the Medicaid Act in providing those services. *Weaver,* 886 F.2d at 197. In *Eder v. Beal,* the Third Circuit rejected Pennsylvania's argument that it should be allowed to terminate an eyeglass program because it was an optional program. 609 F.2d 695, 701–02 (3rd Cir.1979). The court stated that the optional status of the program had no effect on its holding. Specifically, the court held: "The fact that these programs are nominally 'optional' does not mean that a state may terminate them without restraint. Rather, as we have previously indicated, once a state elects to participate in an 'optional' program, it becomes bound by the federal regulations which govern it." *Id.* Although *Eder* addressed the requirement of notice before the termination of benefits, the court finds its reasoning persuasive in this case. The fact that the HSP is an optional service

---

4. The district court granted the plaintiffs' request for summary judgment, holding that the IDPA violated section 1396a(a)(8) by failing to set time standards. *Smith,* 665 F.2d at 174. On appeal, the IDPA only contested the court's decision declaring that all requests for medical care that the IDPA did not process within stipulated time limits were automatically approved. *Id.*

5. The defendants argue that 42 C.F.R. Section 435.906 only applies to new applications for Medicaid. To support this argument, the defendants cite *Kessler v. Blum,* 591 F.Supp. 1013, 1029–30 (S.D.N.Y.1984). Because the court finds that section 1396a(a)(8) applies to more than the initial Medicaid application, the court need not address the applicability of section 435.906.

does not exempt it from the requirements of section 1396a(a)(8).

Both parties point out that section 1396n(c)(3) allows the Secretary to waive certain uniform requirements of the Medicaid Act, such as the requirements relating to statewideness, comparability, and income. 42 U.S.C. Section 1396n(c)(3); *Beckwith*, 912 F.2d at 1140. This section does not allow a waiver of the requirements of section 1396a(a)(8), however. In addition, the State waiver request to the Secretary did not mention limiting applications for the HSP.

### Due Process

The plaintiffs also assert that the defendants are violating their due process rights by refusing to accept applications for the HSP. The court will avoid addressing the constitutional issue unnecessarily because the plaintiffs have a reasonable likelihood of succeeding on the merits of the Medicaid Act argument. *See McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir.1991).

### Balance of Harms

Because the plaintiffs have met their threshold burden of demonstrating the first three factors, the inquiry now becomes a " 'sliding scale' analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits." *Ping*, 870 F.2d at 1371. In this analysis, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach.*, 749 F.2d at 387. The plaintiffs have a reasonable likelihood of success on the merits and have demonstrated that they face great harm if the court denies the injunction. If Paula Malek remains at home with her current level of home care, she risks infections and other complications stemming from her confinement to a wheel chair. If placed in a nursing home, she may loose control over her experimental medication, contact with her surgeons, and the rehabilitation services that she now receives.

At the hearing, Carl Hamilton, the Administrator of the Home Services Program, testified that DORS currently has a waiting list for the HSP. If the court granted an injunction, DORS would have to take services away from the 13,000 existing clients to fund the application process. The application process and the appeals process would deplete the HSP fund, and Mr. Hamilton predicted that it would run out by December, forcing all HSP clients to enter nursing homes. The defendants also argue that the public has a greater interest in a balanced state budget than in a program which benefits a limited portion of the population.

Although the issuance of the injunction may deplete the State's limited HSP budget, providing nursing home care to the plaintiffs would be even more costly. *See* Letter from Audrey McCrimon to Joan Walters, Director, Bureau of the Budget, Plaintiffs' Exhibit 4; 42 U.S.C. Section 1396n(c)(2)(D); *Beckwith*, 912 F.2d at 1140 (to qualify for a proposed waiver, state must show that costs of home care would be less than the costs of institutional care). Thus, the harm to the plaintiffs from the denial of an injunction outweighs the harm to the defendants. In addition, it is not clear where the public interest lies in this case. The public interest in a balanced state budget may be outweighed by an interest in avoiding more costly institutionalization of the plaintiffs. Based on this "sliding scale" analysis, the court concludes that the plaintiffs' have made the showing necessary to receive a preliminary injunction.

IT IS THEREFORE ORDERED that the plaintiffs' motion for a preliminary injunction (docket #5) is allowed. The defendants are restrained and enjoined from refusing to accept and process applications from the plaintiff class for the Home Services Program described in this order.

No security is required of the plaintiffs. They lack the ability to provide security.