Dorothy MORGAN, Plaintiff–Appellant,

v.

COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING, Defendant Appellee.

No. 01CA0629.

Colorado Court of Appeals, Div. I.

March 14, 2002.

Rehearing Denied May 16, 2002.

Certiorari Denied Nov. 4, 2002.

Peter Komlos–Hrobsky, Joel Hayes, Colorado Legal Services, Denver, Colorado, for Plaintiff–Appellant.

Ken Salazar, Attorney General, Ann Hause, First Assistant Attorney General, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge METZGER.

Plaintiff, Dorothy Morgan, appeals the district court's order affirming the final agency decision of the Office of Appeals of the Colorado Department of Health Care Policy and Financing (the agency), which denied her application for Home- and Community-based Services for the Elderly, Blind, and Disabled (HCBS). We affirm.

Plaintiff is in her mid-sixties and suffers from diabetes mellitus, congestive heart fail-

ure, hypertension, obesity, asthma, gout, femoral neuritis, chronic pain in her left leg, and anxiety. Her condition requires that she take extensive medication and supplemental oxygen.

█ Plaintiff applied for HCBS benefits in 1998. HCBS is a Colorado Medicaid home care program providing assistance with dressing, bathing, cooking, cleaning, shopping, transportation, and other services to make it possible for elderly, blind, and disabled persons to avoid institutionalization. Section 26–4–601, et seq., C.R.S.2001; Dep't of Health Care Policy & Financing Reg. No. 8–8.485, et seq., 10 Code Colo. Regs. 2505–10 (DHCP & F Regs.). To be eligible for HCBS benefits, an applicant must have a functional impairment sufficiently severe to require the level of care available in a nursing home. *Martinez v. Ibarra,* 759 F.Supp. 664, 670 (D.Colo.1991)(*Martinez I*); *see also* § 26–4–606, C.R.S.2001.

Level of care determinations are made by Colorado Foundation for Medical Care, a peer review organization (PRO) operating under contract with the state. As the first step in its evaluation process, a PRO case manager conducts an initial assessment in the field. A trained program coordinator, who is a registered nurse, then scores the applicants using a point system. Applicants who score twenty or more points and who have certain other minimum scores qualify automatically for HCBS benefits. DHCP & F Reg. No. 8.401.17(A). If an applicant does not qualify automatically, the PRO refers the application to a physician advisor to determine whether, in spite of the applicant's score, the applicant requires a nursing facility level of care. DHCP & F Reg. No. 8.401.17(B).

Plaintiff scored thirteen points on the initial evaluation and therefore did not qualify automatically. Her application was referred to a physician advisor, who examined her file and determined she was ineligible. Plaintiff requested reconsideration, and a registered nurse from the PRO conducted an on-site assessment at plaintiff's home. This assessment resulted in a score of eleven points. The PRO's reconsideration panel of two physicians then reviewed the entire case, lis-

tened to plaintiff's statement, and determined she was ineligible for HCBS benefits.

Plaintiff then appealed to the agency, and a hearing was scheduled before an Administrative Law Judge (ALJ). One day before the hearing, plaintiff submitted a letter from her treating physician describing her condition; plaintiff also testified at the hearing. The ALJ issued an initial decision determining that plaintiff was ineligible for benefits. Plaintiff filed exceptions to that decision, and the office of appeals of the agency issued a final agency decision affirming the ALJ's initial decision. Plaintiff then filed this § 24–4–106, C.R.S.2001, action in the district court. The court affirmed the final agency decision, and this appeal followed.

I.

Plaintiff first contends the district court erred in concluding that her ineligibility had been determined by using a "uniform assessment instrument," and that, therefore, the requirements of § 26–4–507(3)(d), C.R.S.2001 had been met. We disagree.

A.

Plaintiff argues that, because no scoring sheet associated with the particular assessment instrument adopted by the agency, the ULTC–100 form, appears in the record, and because the agency conceded the form was not used when her application was reconsidered during the on-site assessment, the determination of her ineligibility was fatally flawed. We do not agree.

█ Under § 24–4–106(7), C.R.S.2001, an administrative agency's determination may be reversed only if the court finds the agency acted in an arbitrary and capricious manner, made a determination that is unsupported by the evidence in the record, erroneously interpreted the law, or exceeded its constitutional or statutory authority. *See T.L. v. Colorado Department of Health Care Policy & Financing,* 42 P.3d 63 (Colo.App. 2001). Interpretation of a regulation by the agency charged with its enforcement is generally entitled to great deference and must be accepted if it has a reasonable basis in law

and is warranted by the record. *See Ohlson v. Weil,* 953 P.2d 939 (Colo.App.1997).

The agency is required to employ "a uniform assessment instrument," in the "comprehensive and uniform client assessment process." Section 26–4–507(2)(d), (3)(d), C.R.S.2001. The agency has adopted the ULTC 100 form for this purpose. *See* DHCP & F Reg. No. 8.401.16. The PRO nurses review the information obtained and score it on the ULTC 100 form. DHCP & F Reg. No. 8.401.17(A).

The PRO uses the required ULTC–100 form for intake, but does not use it directly in making the final calculation of an applicant's score. Instead, a registered nurse converts the information from the ULTC form to a "LTC–100 Worksheet" and then computes an applicant's final score from that worksheet. The PRO has written guidelines governing this conversion process and also provides special training to the registered nurses who perform this function.

Here, the PRO case manager gathered plaintiff's information and recorded it on a computerized version of the ULTC–100 form. The PRO registered nurse then converted this information to the LTC–100 worksheet to arrive at plaintiff's score. When plaintiff asked for reconsideration, a PRO registered nurse conducted an on-site review using the LTC–100 worksheet. The record contains scores from the LTC–100 worksheet for both the initial evaluation and the on-site review, but it does not contain the score sheet for the ULTC–100 form.

The final agency decision rejected plaintiff's argument that the PRO had not properly used the ULTC–100 form. It held that, because the agency had used the form at some point in the process, that was sufficient compliance with § 26–4–507(3)(d). The district court upheld this determination.

■ We agree with this reasoning. The agency must use the ULTC–100 form "as part of the comprehensive and uniform client assessment process." Section 26–4–507(3)(d). The agency here satisfied this requirement by using the ULTC–100 form to gather the initial information concerning plaintiff's condition. We find nothing in the statutes or regulations that would require the agency to derive scores directly from the ULTC–100 form at every stage of the process. Thus, because the agency's method of using the ULTC–100 form has a reasonable basis in the law, and because the record is clear that the form was used in the initial stage of plaintiff's assessment process, we reject her argument.

### B.

Plaintiff also argues that, because the criteria in the LTC–100 worksheet are different and more restrictive than those in the ULTC–100 form, the agency's use of the LTC–100 worksheet in later stages of the HCBS eligibility determination process violated the requirements of § 26–4–507(3)(d). We are not persuaded.

■ An applicant's level of impairment must be evaluated in "at least" fifteen enumerated areas: confusion, contact with reality, behavior, communication, mobility, bathing, dressing, eating and feeding, bowel continence, bladder continence, skin care, vision, hearing, need for supervision and observation, and living skills, such as cooking, shopping, and laundry. *See* DHCP & F Reg. No. 8.401.11. These are the criteria listed on the LTC–100 worksheet.

In contrast, the ULTC–100 form calls for information in seventeen areas: transfers, bladder care, bowel care, mobility, dressing, bathing, hygiene, eating, meal preparation, housework, laundry, shopping, medicine management, appointment management, money management, access resources, and telephone.

Although the two forms differ slightly, they are not so disparate as to violate the requirements of § 26–4–507(3)(d). For example, where the LTC–100 worksheet has a single category for living skills such as cooking, shopping, and laundry, the ULTC–100 form has separate categories for these criteria. Moreover, the existence of written guidelines for converting information from one form to the other demonstrates that the two forms contain similar criteria. Thus, contrary to plaintiff's contention, the LTC–

100 worksheet is not more restrictive than the ULTC–100 form.

Consequently, the district court was correct in concluding that the agency's assessment instruments met the applicable statutory and regulatory requirements.

## II.

Plaintiff next contends the district court erred in determining that the use of the unpublished criteria in the LTC–100 worksheet to evaluate her HCBS eligibility did not violate § 24–4–101, et seq., C.R.S.2001, the Administrative Procedure Act (APA), the delegation doctrine, and her right to due process. We find no error.

### A.

First, we reject plaintiff's argument that the use of the unpublished criteria in the LTC–100 worksheet violated the APA.

An applicant's scores must be based on criteria developed by the PRO and approved by the state. DHCP & F Reg. No. 8.401.17(A).

"No rule shall be relied upon or cited against any person unless ... it has been published and ... it has been made available to the public in accordance with this section." Section 24–4–103(10), C.R.S.2001. However, interpretive rules and general statements of policy do not require publication. Section 24–4–103(1), C.R.S.2001.

■ Here, the scoring criteria in the LTC–100 worksheet have not been published as a regulation. The agency concedes that these criteria are subject to change without public notice and that it is not possible, without these criteria, to determine whether an applicant meets HCBS requirements.

In *Meyer v. Colorado Department of Social Services*, 758 P.2d 192 (Colo.App.1988), a division of this court held that the termination of Medicaid-funded nursing home care benefits could be based on an unpublished point system. The division concluded the failure to publish the point system did not violate the APA because the point system was not the dispositive factor in the decision to terminate benefits. It reasoned that, be-

cause it "served only to trigger further consultation and review," the point system was not a binding rule requiring publication under § 24–4–103(1). *Meyer v. Colorado Department of Social Services, supra*, 758 P.2d at 196.

Similarly, here, we conclude that the scoring system in the LTC 100 worksheet serves only to facilitate the evaluation process for certain applicants. As required by *Meyer v. Colorado Department of Social Services, supra*, the final factual determination of eligibility is made by a physician advisor and a reconsideration panel of physicians, who remain free to make independent medical judgments about an applicant's qualifications.

Therefore, the district court properly concluded the agency did not violate the APA by using the unpublished criteria in the LTC–100 worksheet in the assessment of plaintiff's functional needs.

### B.

We also reject plaintiff's argument that the use of the unpublished criteria in the LTC–100 worksheet violated the delegation doctrine.

■ The delegation doctrine requires that states provide "sufficient statutory standards and safeguards and administrative standards and safeguards, in combination, to protect against unnecessary and uncontrolled exercise of discretionary power." These standards must be sufficient to ensure that agency action is rational and consistent, and must provide for meaningful appellate review. *Cottrell v. City & County of Denver*, 636 P.2d 703, 709 (Colo.1981).

■ Here, the pertinent factors are established both by statute and regulation. Section 26–4–507(2)(a), C.R.S.2001, provides that the factors to be considered are eating, bathing, dressing, transferring from bed to chair, bowel and bladder control, and independent ambulation. Section 26–4–507(2)(g), C.R.S. 2001, lists additional factors: cooking, cleaning, using a telephone, shopping, doing laundry, providing transportation, and managing money. The "assessment instrument" adopted by the agency must include all of

these factors. Section 26–4–507(3)(d)(I)(A), C.R.S.2001. By regulation, the agency must evaluate applicants in at least fifteen areas. *See* DHCP & F Reg. No. 8.401.11. It does so using the LTC–100 worksheet, which, as we have held, is consistent with the statutory and regulatory requirements.

We agree with the trial court that the statutory and administrative standards provide sufficient safeguards to comply with the requirements of the delegation doctrine and that the agency's use of the LTC–100 worksheet, which comports with these standards, did not violate the doctrine.

### C.

We reject plaintiff's argument that the use of unpublished criteria in the LTC–100 worksheet violated her right to due process.

■ "[D]ue process requires that welfare assistance be administered to ensure fairness and freedom from arbitrary decision-making as to eligibility"; this, in turn, requires "written standards and regulations." *White v. Roughton,* 530 F.2d 750, 753, 754 (7th Cir.1976); *see also Martinez I, supra.* Due process is satisfied in the Medicaid context where the agency uses a hearing procedure that includes review by independent physicians, with "clear, written standards controlling the substance and procedure of the physician review." *Martinez I, supra,* 759 F.Supp. at 670; *see also Martinez v. Ibarra,* 762 F.Supp. 873 (D.Colo.1991)(*Martinez II*).

When the agency denies HCBS benefits based on its scoring system, a physician advisor must evaluate the applicant's file and determine whether he or she requires a nursing facility level of care. *See* DHCP & F Reg. No. 8.401.17(B), (C). If the physician advisor determines benefits should be denied, the applicant may request an informal conference with a reconsideration panel of physicians. *See* DHCP & F Reg. Nos. 8.059.121(B), 8.401.17(F).

■ Here, plaintiff's application was evaluated by both a physician advisor and a reconsideration panel. The physician advisor examined the entirety of plaintiff's file. The reconsideration panel also reviewed that file,

considered the registered nurse's on-site assessment results, and heard plaintiff's testimony about her functional impairments.

This level of review, using statutory and regulatory standards, was sufficient to protect plaintiff's due process rights.

### III.

Plaintiff next contends the district court erred in concluding her HCBS eligibility was properly "determined" by a physician, as mandated by *Martinez I & II, supra.* She argues the physician advisor did not independently assess her eligibility because he relied on the PRO file and did not personally examine her. We disagree.

When an applicant fails to meet the minimum score to qualify automatically for HCBS benefits, the regulations provide for a "determination" by a PRO physician:

B. [A PRO physician] shall determine the individual's need for the level of services provided in a nursing facility. Such determination shall be based upon the professional judgment of the physician advisor who shall determine whether the individual's condition requires the skilled and maintenance services provided in a nursing facility.

C. The PRO physician's review, shall include the information provided by the individual's treating physician, the functional assessment screen, the [additional screen required for certain applicants] (if applicable), the information obtained on the on-site review (if applicable ...) and any other information in the individual's case file.

DHCP & F Reg. No. 8.401.17.

■ The purpose of additional levels of review is to determine whether, in spite of the applicant's score, he or she requires a nursing facility level of care. *See Martinez I & II, supra.*

■ Here, the physician advisor examined the documents in plaintiff's file. These documents included the results of the functional assessment and diagnostic and medication information from plaintiff's treating physician. The physician advisor did not

conduct a personal examination, nor did he speak to plaintiff or to her treating physician. The agency and the trial court found that review to be sufficient. We do not disagree.

The materials that a physician advisor is required to consider are sufficient to determine whether an applicant requires a nursing facility level of care, because those materials have been previously collected as part of a detailed and specific process. There is no requirement that a physician advisor must conduct a personal examination of the applicant or contact the treating physician. Because the physician advisor here considered all of the materials required and rendered his independent medical judgment, we agree with the district court that the independent review requirements of *Martinez I & II, supra,* were met.

## IV.

Next, plaintiff contends the district court erred in concluding that the ALJ gave proper consideration to her testimony and to a letter from her treating physician. We disagree.

### A.

First, we reject plaintiff's contention she was entitled to a written decision from the ALJ that discussed the evidence in more detail.

■ Hearings regarding Medicaid benefits must comport with the standards of *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). 42 C.F.R. § 431.205(d) (2001). The relevant requirements are that "the decision maker should state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." *Goldberg v. Kelly, supra,* 397 U.S. at 271, 90 S.Ct. at 1022, 25 L.Ed.2d at 301 (citation omitted).

Federal regulations regarding Medicaid hearings provide that, in a de novo hearing, the decision must specify the reasons for the decision and identify the supporting evidence

and regulations. 42 C.F.R. § 431.244(e) (2001).

Here, the ALJ found:

[Plaintiff] credibly testified that her overall physical condition has worsened in that she falls more frequently and she has had more incidents of bladder incontinence than she did at the time of the on-site evaluation. [Plaintiff] remains capable of managing her medication needs with the help of her family, but she needs more than minimal assistance with dressing herself.

After discussing the pertinent regulations, the ALJ concluded:

The preponderance of the evidence establishes that [plaintiff] does not qualify for HCBS–EBD services. While the evidence reflects that [plaintiff] is elderly and functionally impaired, she does not require skilled and maintenance services available in a nursing facility. The assistance she requires is provided by relatives and friends and she remains capable of managing her self-care and medication needs. Further, the medical judgment of the physicians is that [plaintiff] does not require the level of services provided in a nursing facility nor is she services dependent.

■ Even though this decision does not discuss plaintiff's testimony in detail, it does specify the evidence relied on and explains the ALJ's reasoning. While the ALJ might appropriately have provided a more thorough discussion of the evidence, we cannot say that the decision is deficient under 42 C.F.R. § 431.244(e) and the requirements of *Goldberg v. Kelly, supra.*

Therefore, the district court did not err in concluding the ALJ gave proper consideration to plaintiff's testimony.

### B.

■ Finally, we disagree with plaintiff that the district court erred in concluding the agency gave appropriate weight to the opinion of her treating physician.

Plaintiff's treating physician submitted information to the ALJ by letter. It is clear to us that the ALJ considered that information,

because his findings incorporated it. However, the ALJ did not specifically discuss the relative weight he gave this evidence.

The final agency decision stated: "Perhaps most importantly, the letter from [plaintiff's] treating physician simply does not address the key issue in these proceedings, i.e., it does not state that [plaintiff] is [in] need of a nursing facility level of care." The district court concluded that "the ALJ most likely found that the letter did not address the pertinent issues at hand."

Because the evidence from plaintiff's treating physician did not include his opinion on the pivotal issue before the agency—whether plaintiff needed a nursing facility level of care—we reject plaintiff's contention.

The order is affirmed.

Judge ROTHENBERG and Judge KAPELKE concur.